**ALLIED ERECTING AND DISMANTLING COMPANY, INC., Appellant,**

v.

**CITY OF YOUNGSTOWN, Appellee.**

[Cite as *Allied Erecting & Dismantling Co., Inc. v. Youngstown,*
151 Ohio App.3d 16, 2002-Ohio-5179.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 00 CA 225.

Decided Sept. 26, 2002.

20

Nadler, Nadler & Burdman and Jay M. Skolnick; Eckert, Seamans, Cherrin & Mellott, L.L.C., Christopher Opalinski and Jarrell D. Wright for appellant.

Manchester, Bennett, Powers & Ullman and Joseph R. Young, for appellee.

DeGenaro, Judge.

{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments to this court. Plaintiff-appellant, Allied Erecting & Dismantling Co., Inc., appeals from the trial court's judgment granting defendant-appellee Youngstown's motion for judgment not-withstanding the verdict. The city has filed conditional assignments of error in support of the trial court's judgment. The issues before us are whether (1) the city is protected by governmental immunity, and, if so, was the defense waived; (2) the jury's damage award was speculative, thereby warranting a new trial; and (3) granting plaintiff leave to amend its complaint at the close of defendant's case, thereby resulting in charging the jury on a claim for conversion, was an abuse of discretion. Because we conclude that the city was engaged in a proprietary function and therefore not immune from suit pursuant to R.C. Chapter 2744, and that the jury's award of damages was based upon competent, credible evidence, we reverse the trial court's judgment and reinstate the jury's verdict in favor of Allied.

{¶ 2} The Pittsburgh & Lake Erie Railroad Company owned a main rail line, which ran along the Mahoning River from Lowellville to the Mahoning County–Trumbull County border. P&LE decided to sell the property comprising that line. Allied, as an enterprise engaged in the business of industry dismantling and scrap salvaging, was interested in portions of the rail line and, on February 19, 1992, entered into an Agreement of Sale with P&LE. This agreement sold four parcels of land to Allied along with a right of first refusal to purchase the remaining land and track materials adjacent to the four parcels.

{¶ 3} On May 17, 1993, P&LE and Allied entered into an Amendment To Agreement of Sale and Reciprocal Easement Agreement. This document amended Allied's right of first refusal. Allied now had the right of first refusal to purchase "that portion of P&LE's main line including land, rail and materials thereon, located between * * * Survey Station 45 + 00 + * * * and 153 + 00 + * * *, said portion of main line being partially adjacent to [the parcels of land purchased in the original agreement], in the event the main line is relocated or abandoned, or the balance of the main line west and north of Survey Station 153 + 00 + is sold to the City of Youngstown, Ohio." Exhibit 6, Amendment to Agreement of Sale and Reciprocal Easement Agreement, at 1.

{¶ 4} The amendment went on to define precisely how Allied would exercise that right of first refusal. However, that amendment also granted Allied a further right of first refusal "to purchase the Track Materials only consisting of all rail, O.T.M., R.R. ties, and salvageable ballast (slag) thereon located between Survey Station 153 ± 00 ± and Survey Station 424 ± 00 ± (Trumbull County/Mahoning County line) * * *. P&LE and its successors grant to Allied Erecting and its successors two years from the date of payment to remove the Track Material from the site." [1] Id. at 2.

{¶ 5} A few days later, on May 20, 1993, P&LE entered into a purchase agreement with the city, selling "the real property including fixtures and appurtenant structures thereon, but excluding all rail track materials and ties" located between Survey Stations 153 + 00 + and 209 + 17.54 +. ("Parcel A") The agreement provided that P&LE or its contractor "shall, at its own expense, remove all railroad ties and rail and track materials" from Parcel A within 90 days. On the same day P&LE and the city entered into a contemporaneous purchase agreement for "the real property including fixtures and appurtenant structures thereon, but excluding all rail track materials and ties" located between Survey Station 209 + 17.54 + and 423 + 52.4 + ("Parcel B"). This agreement provided that P&LE had 24 months to "remove all railroad ties and rail and other track materials" from Parcel B.

{¶ 6} After notification of P&LE's sale to the city, Allied exercised its right of first refusal and purchased "all rail, other track material, salvageable ballast and ties (whether attached to track or not)" between Survey Station 153 + 00 + and 424 + 00 + on June 22, 1993. In the agreement, Allied agreed to remove the material from Parcel A within 90 days of the date the city acquired title to Parcel A and to remove the materials from Parcel B within 24 months of the date the city acquired title to Parcel B. At this time, Allied received notification from P&LE only that it could begin working on Parcel A. Allied removed the

---

1. "O.T.M." stands for "other track materials."

materials, including the slag and ballast, within the 90–day period. At no time did Allied learn that the city had ever obtained title to Parcel B. However, the city obtained title to that parcel on September 6, 1994.

{¶ 7} In late 1994, Allied's president realized that someone had started to take the rail and track material from Parcel B. In an effort to save its investment, Allied proceeded to remove the rail, ties, and other materials. As Allied began to remove the slag and ballast, the city notified Allied that "the slag and ballast located on the property belongs [sic] to the City of Youngstown and is *not* to be removed by your company" and if Allied attempted to remove the slag, "the City will consider filing criminal charges for the unauthorized taking of City property." Although Allied thought that it owned the ballast, it stopped removing it due to the threat of criminal charges. The city later sold the property to a third party who, more than two years after the city obtained title to Parcel B, removed the ballast.

{¶ 8} On June 29, 1995, Allied filed a complaint naming the city as the sole defendant. The complaint specifically stated two counts: declaratory judgment and breach of contract. The matter proceeded to trial on April 17, 2000. At the close of Allied's case, the city orally moved for directed verdict on Allied's claims for declaratory judgment and breach of contract. The trial court granted the city's motion as to the claim of declaratory judgment without objection but deferred ruling on the motion as to the claim for breach of contract. At the close of the city's case, it renewed its motion for directed verdict. The trial court granted the motion as to the declaratory judgment and breach-of-contract claims. However, the trial court agreed to instruct the jury on tortious interference with a contract and conversion, finding that the complaint set forth the elements of those torts. The jury returned with a $2 million verdict in Allied's favor on April 24, 2000.

{¶ 9} On May 8, 2000, the city filed a motion for JNOV, in which it asserted for the first time the defense of sovereign immunity and in the alternative moved for a new trial challenging the amount of the jury's verdict. After a hearing on these motions and one filed by Allied, the trial court entered its judgment on October 5, 2000, finding that the city had not waived its defense of political subdivision immunity and granted the city's motion for JNOV. The trial court also stated that if it had reached the merits of the city's motion for a new trial, that motion would have been granted because the jury award was not supported by the manifest weight of the evidence because it was too speculative. This appeal ensued.

{¶ 10} Allied presents three assignments of error:

{¶ 11} "The trial court's entry of judgment notwithstanding the verdict ("JNOV") against Allied in favor of the City on the grounds of governmental

immunity was error because the trial court's predicate finding—that the City was engaged in the governmental function of protecting its own property—was based on its failure to construe the evidence most strongly in Allied's favor, and because a proper view of the evidence would have shown that Allied, not the City, owned the property at issue and that the City was therefore engaged in a proprietary function not subject to governmental immunity."

{¶ 12} "The trial court's entry of JNOV against Allied and in favor of the City on the grounds of governmental immunity was error because this defense had no application to Allied's breach of contract claim and because the City waived the defense by failing to raise it at any time during the five years before trial, despite the fact that the City knew or should have known that Allied had also pleaded a conversion claim sounding in tort."

{¶ 13} "The trial court's alternative holding—that it could direct a new trial on the grounds that the jury's verdict of two million dollars was not supported by the manifest weight of the evidence and that Allied's evidence of damages was too speculative to warrant a verdict of that size—was error because the record is replete with sound evidence regarding the quantity of the material at issue and the unit value of that material."

{¶ 14} The city has submitted two conditional assignments of error should this court reverse the trial court:

{¶ 15} "The trial court abused its discretion in granting Allied leave to amend its complaint after Allied rested."

{¶ 16} "The trial court erred to the prejudice of the City in the court's instruction of law on conversion."

{¶ 17} We conclude that the trial court erred when it granted JNOV to the city because the city was engaged in a proprietary function and was, therefore, not immune from suit pursuant to R.C. Chapter 2744. Additionally, we conclude that the trial court erred when it conditionally granted a new trial on the issue of damages because the jury's award was based upon competent, credible evidence. Finally, we conclude that neither of the city's conditional assignments of error supports the trial court's judgment.

{¶ 18} In Allied's first assignment of error, it contends that the trial court failed to construe the evidence most strongly in favor of the party against whom the motion was made when ruling on the motion for JNOV by finding that the city was immune from suit because it was engaged in a governmental function. The determination as to whether a political subdivision is immune from suit is a question of law properly determined by a trial court. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 292, 595 N.E.2d 862 quoting *Donta v. Hooper* (C.A.6, 1985), 774 F.2d 716, 719, certiorari denied (1987), 483 U.S. 1019, 107 S.Ct. 3261, 97

L.Ed.2d 760, and citing *Roe v. Hamilton Cty. Dept. of Human Serv.* (1988), 53 Ohio App.3d 120, 126, 560 N.E.2d 238. The test to be applied by a trial court when considering a motion for JNOV is the same test to be applied on a motion for a directed verdict. *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511.

{¶ 19} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." Civ.R. 50(A)(4).

{¶ 20} Motions for either a directed verdict or JNOV test the legal sufficiency of the evidence and, therefore, present a question of law even though in deciding such motions it is necessary to review and consider the evidence. *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 31 OBR 250, 509 N.E.2d 399. Questions of law are reviewed de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, a motion for JNOV must be denied. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828.

{¶ 21} The trial court determined that the city was immune from suit because it engaged in a governmental function when it prevented Allied from taking the ballast. The trial court concluded that it was immaterial who actually owned the slag because "the protection of materials located upon a political subdivision's land is a function which would customarily be engaged in only by a 'government' person; i.e., a non-government person does not normally attempt to protect property owned by a city."

{¶ 22} Allied argues that this is incorrect because the city's actions were proprietary in nature and, therefore, the city was no longer immune from suit.

{¶ 23} The Political Subdivision Tort Liability Act affords political subdivisions immunity from certain types of actions. The exceptions and defenses to liability are set forth in R.C. 2744.02 and 2744.03. In order to determine whether a political subdivision is immune from a particular action, R.C. Chapter 2744 requires a three-tiered analysis. *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 697 N.E.2d 610.

{¶ 24} "Under the first tier, R.C. 2744.02(A) grants broad immunity to political subdivisions. If immunity is established under R.C. 2744.02(A), such immunity is not absolute, however. Under the second tier of the analysis, one of

five exceptions set forth in R.C. 2744.02(B) may serve to lift the blanket of general immunity. Our analysis does not stop here, because under the third tier of the analysis, immunity may be 'revived' if the political subdivision can demonstrate the applicability of one of the defenses found in R.C. 2744.03(A)(1) through (5)." *Summers v. Slivinsky* (2001), 141 Ohio App.3d 82, 86–87, 749 N.E.2d 854.

{¶ 25} Clearly, Allied's claims for conversion and tortious interference with a contract fall within the general grant of immunity found in R.C. 2744.02(A)(1). Thus, it is protected under the first tier of analysis.

{¶ 26} Under the second tier of analysis, we must determine whether one of the exceptions to immunity found in R.C. 2744.02(B) applies. This is the crux of the dispute between the parties. R.C. 2744.02(B) provides:

{¶ 27} "Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function * * *:

{¶ 28} "* * *

{¶ 29} "(2) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."

{¶ 30} "In order to take advantage of the exception contained within R.C. 2744.02(B)(2), the city must have been engaged in a proprietary, rather than a governmental, function. A political subdivision engages in a governmental function when that function is:

{¶ 31} "(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

{¶ 32} "(b) A function that is for the common good of all citizens of the state;

{¶ 33} "(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by non-governmental persons; and that is not specified in division (G)(2) of this section as a proprietary function." R.C. 2744.01(C)(1).

{¶ 34} In contrast, a political subdivision engages in a proprietary function when:

{¶ 35} "(a) The function is not [a governmental function];

{¶ 36} "(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that *involves activities that are customarily engaged in by nongovernmental persons.*" (Emphasis added.) R.C. 2744.01(G)(1).

{¶ 37} R.C. 2744.01(G)(2) is a nonexclusive list of proprietary functions. The city's actions in this case were not specified in either R.C. 2744.01(C)(2) or (G)(2).

{¶ 38} The Ohio Supreme Court addressed how courts are to distinguish between functions customarily engaged in by governmental and nongovernmental persons in *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St.3d 551, 733 N.E.2d 1141. At issue was whether improperly entering a hog into a hog show at a county fair was a governmental or a proprietary function:

{¶ 39} "In resolving this question, we must first recognize that a central consideration within the structure of R.C. Chapter 2744 is the premise that some activities of a political subdivision may be governmental functions, while some other activities are not. Thus, the issue here is not whether holding a county fair is a governmental function; rather, it is the more specific question of whether conducting the hog show at the county fair and conducting the investigation into the allegations of irregularity surrounding the entry of Big Fat in that hog show are governmental functions.

{¶ 40} "It is apparent to us that even though conducting a county fair may be an activity not customarily engaged in by nongovernmental persons, conducting a livestock competition is an activity customarily engaged in by nongovernmental persons. Any organization, whether private or public, can hold a competition of this type. The consideration that many such competitions are conducted within county fairs cannot change the fact that there is nothing inherently governmental about them. In this situation, educational value alone is not enough to convert what otherwise would not be a governmental function into something that is a governmental function. We see no reason to distinguish a livestock competition at a county fair from any other similar competition, such as a livestock competition held elsewhere than at a county fair, or a dog or cat show, or an art show, or a chili cook-off, or a beauty pageant, or a car show." Id. at 560, 733 N.E.2d 1141.

{¶ 41} As *Greene Cty.* illustrates, the key in determining whether a political subdivision is acting in a governmental or proprietary manner is in defining what it is that the political subdivision is actually doing when performing the function. This court had the opportunity to apply *Greene Cty.* in *Summers*. This court quoted *Greene Cty.*'s statement that when a political subdivision is not specifically listed in R.C. 2744.01(F), the exceptions to immunity found in R.C. 2744.02(B) " 'should be construed in a way that leads to a finding of immunity for only the central core functions of the political subdivision.' " Id. at 90, 749 N.E.2d 854, quoting *Greene Cty.* at 560, 733 N.E.2d 1141.

{¶ 42} "The logical corollary to this principle is that if the political subdivision is one of those specifically listed in R.C. 2744.01(F), the exceptions to immunity found in R.C. 2744.02(B) should be construed more broadly. School districts are one of the political subdivisions specifically listed in R.C. 2744.01(F). Therefore, R.C. 2744.02(B) should be construed liberally in its favor.

{¶ 43} "* * *

{¶ 44} "While there are certainly instances of professional, paid cheerleading squads that can be compared to the current situation, this is not the customary situation. We are in agreement with the holdings of *Neelon* [*v. Conte* (Nov. 13, 1997), Cuyahoga App. No. 72646, unreported, 1997 WL 711232] and *Anderson* [*v. Indian Valley School Dist. Bd. of Edn.* (Mar. 22, 1999), Tuscarawas App. Nos. 1998AP122, 1998AP123 and 1998AP124, unreported, 1999 WL 175218] and hold that a school-sponsored cheerleading practice is part of a school district's broad governmental function of providing public education. Therefore, it does not fall within the exception to political subdivision immunity under R.C. 2744.02(B)(4)." Id. at 90–91, 749 N.E.2d 854.

{¶ 45} The present case requires us to revisit our decision in *Summers* and ask how liberally we are to construe R.C. 2744.01(G)(1)(b) in favor of governmental immunity. In *Greene Cty.*, the Ohio Supreme Court held:

{¶ 46} "[W]hen the political subdivision at issue is not one of the bodies specifically mentioned within R.C. 2744.01(F), the exceptions to immunity of R.C. 2744.02(B) should be construed in a way that leads to a finding of immunity for only the central core functions of the political subdivision." Id. at 560, 733 N.E.2d 1141.

{¶ 47} In *Summers,* this court held that the "logical corollary" to this rule "is that if the political subdivision is one of those specifically listed in R.C. 2744.01(F), the exceptions to immunity found in R.C. 2744.02(B) should be construed more broadly." Id. at 90, 749 N.E.2d 854. When reviewing this statement and its consequences, we agree with the dissent in *Summers.* We reject the idea that it is a necessary logical corollary to *Greene Cty.*'s holding that immunity should be broadly construed for those entities listed in R.C. 2744.01(F). While this rule is certainly related to that in *Greene Cty.*, the mere fact that we must limit immunity for one group of political subdivisions to their core functions does not mean we expand immunity to its furthest reaches for all other political subdivisions.

{¶ 48} Under *Summers,* virtually any activity that any political subdivision specifically listed in R.C. 2744.01(F) engaged in would be defined as a governmental function. This would make R.C. 2744.01 inherently contradictory. As illus-

trated in the dissent, this surely cannot be what the legislature meant when it crafted the Political Subdivision Tort Liability Act.

{¶ 49} "[T]he legislature included as a governmental function '[t]he provision of a system of public education.' R.C. 2744.01(C)(2)(c). It included as proprietary functions the operation of public stadiums, bands, or orchestras. R.C. 2744.01(G)(2)(e). These proprietary functions are performed by virtually every school district. In *Greene,* the Ohio Supreme Court held that livestock competitions are proprietary functions performed within the government function of holding a county fair. Likewise, school districts operating a stadium, band, or orchestra are performing proprietary functions, even though those functions aid in the provision of education. I agree with the trial court's observation that cheerleading is not distinguishable from bands or orchestras." Id. at 94, 749 N.E.2d 854 (Vukovich, J., dissenting).

{¶ 50} "[A]pplying such broad immunity to governmental wrongdoers gives no encouragement to do right, and no liability or penalty for doing wrong. When there is no accountability for failure, failure is sure to follow." *Butler v. Jordan* (2001), 92 Ohio St.3d 354, 374, 750 N.E.2d 554.

{¶ 51} We recognize the danger in overruling our decision so soon after announcing it. Doing so may cause legal uncertainty both within our district and throughout the state. However, as Justice Clifford F. Brown stated in his concurring opinion in *Baker v. McKnight* (1983), 4 Ohio St.3d 125, 4 OBR 371, 447 N.E.2d 104, if a case is bad law when it is decided, then it must be overruled. Id. at 129, 4 OBR 371, 447 N.E.2d 104 (C. Brown, J., concurring). "It takes more courage to admit a mistake than to stick our heads in the sand of stare decisis and adhere to a holding which perpetuates a recognized injustice." Id.

{¶ 52} Accordingly, we believe that the best rule in a case such as this is the one found in the statute. When deciding whether a political subdivision is engaged in a governmental or proprietary function pursuant to R.C. 2744.01(G)(1)(b), a court should look to the particular activity the subdivision is engaged in and decide whether that particular activity is of the type customarily engaged in by nongovernmental persons.

{¶ 53} Applying this rule to this case, we find that the trial court misapplied R.C. Chapter 2744 by incorrectly framing the issue before it. The issue is not whether nongovernmental persons would customarily protect government property; rather, it is whether nongovernmental persons would customarily try to protect their own property. The answer to this, of course, is an emphatic yes. It is illogical to suggest that the city, when threatening to press criminal charges against Allied, was acting any differently than any other property owner threatening an alleged trespasser with criminal charges. Therefore, when the

city prevented Allied from removing the ballast, it was engaged in a proprietary function. Thus, if the jury found it did so negligently, then the city's actions fall within R.C. 2744.02(B)(2)'s exception to the rule of general immunity found in R.C. 2744.02(A).

{¶ 54} Of course, this does not mean that Allied's suit may still proceed against the city. We must now consider the third tier of the *Cater* analysis, whether the city's immunity can be revived through the defenses found in R.C. 2744.03. However, "under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that one of the defenses contained in R.C. 2744.03 applies." *Cater* at 28, 697 N.E.2d 610. In this case, the city has never argued that any of those defenses do apply. Because the city does not argue that one of the R.C. 2744.03 defenses applies, that argument is waived.

{¶ 55} In conclusion, the trial court erred when it found that the city was engaged in a governmental function. Rather, the city was engaged in precisely the same type of activity that a nongovernmental person would be engaged in, namely, protecting its own property. Thus, the city was engaged in a proprietary function and was no longer immune from suit under R.C. Chapter 2744. Allied's first assignment of error is meritorious.

{¶ 56} In Allied's second assignment of error, it claims that the trial court erred when it granted JNOV because the city had waived immunity by not asserting that defense in a timely fashion and because that defense has no application to Allied's breach-of-contract claim. As we hold that the city may not take advantage of the immunity provided in R.C. Chapter 2744, it does not matter whether the city waived that defense or whether that defense applied to Allied's breach-of-contract claim. Accordingly, we will not address this assignment of error because it is moot.

{¶ 57} In its final assignment of error, Allied asserts that it was error for the trial court to conditionally grant a new trial on the grounds that the damages were against the manifest weight of the evidence for two reasons. First, the trial court did not state the reasons for its ruling with sufficient specificity and, second, the city's arguments in support of a new trial lack merit. The city argues that the trial court was correct in finding the jury's award speculative because the offending action took place in 1995 and Allied introduced market value of only slag and ballast from 1999 and 2000.

{¶ 58} Pursuant to Civ.R. 50(C)(1), a trial court may conditionally grant a new trial when granting a JNOV and such a conditional grant does not affect the finality of the judgment. When ruling on a Civ.R. 59 motion for a new trial, a trial court does not weigh the evidence in the substantially unlimited sense that

the weight and credibility are passed on originally by the jury, but in a restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence. *White v. Center Mfg. Co.* (1998), 126 Ohio App.3d 715, 728, 711 N.E.2d 281.

{¶ 59} "[W]here there is a motion for a new trial upon the ground that the judgment is not sustained by sufficient evidence, a duty devolves upon the trial court to review the evidence adduced during the trial and to itself pass upon the credibility of the witnesses and the evidence in general. It is true that, in the first instance, it is the function of the jury to weigh the evidence, and the court may not usurp this function, but, when the court is considering a motion for a new trial upon the sufficiency of the evidence, it must then weigh the evidence. A court may not set aside a verdict upon the weight of the evidence upon a mere difference of opinion between the court and jury." *Poske v. Mergl* (1959), 169 Ohio St. 70, 73–74, 8 O.O.2d 36, 157 N.E.2d 344.

{¶ 60} When considering a motion for new trial, the trial court must abstain from disturbing the verdict unless it determines that the jury's damage assessment was so overwhelmingly disproportionate as to shock reasonable sensibilities. *Driscoll v. NorProp, Inc.* (1998), 129 Ohio App.3d 757, 766, 719 N.E.2d 48, quoting *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 104, 670 N.E.2d 268.

{¶ 61} A trial court is afforded wide discretion when ruling on a Civ.R. 59 motion for a new trial and will be reversed only upon a showing that the trial court abused that discretion. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph one of the syllabus. " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment].' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541 quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. " 'Where a jury verdict is supported by substantial competent, credible evidence, it is an abuse of discretion to grant a motion for a new trial.' " *Meyers v. Hot Bagels Factory, Inc.* (1999), 131 Ohio App.3d 82, 97, 721 N.E.2d 1068, quoting *Hancock v. Norfolk & W. Ry. Co.* (1987), 39 Ohio App.3d 77, 81, 529 N.E.2d 937. "Abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 62} Allied recovered under a theory of conversion. "The measure of damages in a conversion action is the value of the converted property at the time it was converted." *Tabar v. Charlie's Towing Serv., Inc.* (1994), 97 Ohio App.3d 423, 428, 646 N.E.2d 1132. In contrast, the general measure of damages

in a contract action is the amount necessary to place the nonbreaching party in the position he or she would have been in had the breaching party fully performed under the contract. *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.* (1976), 47 Ohio St.2d 154, 159, 1 O.O.3d 90, 351 N.E.2d 121. Accordingly, in order to recover damages for conversion, Allied must have introduced competent, credible evidence on both the amount and per-unit price of the ballast.

{¶ 63} At trial, Allied and the city each introduced an expert testimony on the amount of ballast on Parcel B. Although the experts disagreed on the amount of ballast present at the time the contracts were entered into, both experts explained how they came to their conclusions. Therefore, the trial court could not have found this to be too speculative as the basis for a new trial and the city does not argue as such. Instead, the city argues that the per-unit price of the ballast is too speculative for the jury to rely upon in its damage calculation.

{¶ 64} " 'As a general rule, once a plaintiff establishes a right to damages, that right will not be denied because the damages cannot be calculated with mathematical certainty. * * * However, damages will not be awarded based on mere speculation and conjecture. * * * The plaintiff must show entitlement to damages in an amount ascertainable with reasonable certainty. * * * In assessing prospective damages, the trier of fact can only consider damages which are reasonably certain to follow the injury complained of.' " *Hollobaugh v. D & V. Trucking* (May 8, 2001), 7th Dist. No. 99 CA 303, at 5, 2001 WL 537058, quoting *Barker v. Sundberg* (Oct. 25, 1993), 11th Dist. No. 92–A–1756, at 4, 1993 WL 489236.

{¶ 65} In other words, recovery is precluded only when the existence of damages is uncertain, not when the amount is uncertain. *Pietz v. Toledo Trust Co.* (1989), 63 Ohio App.3d 17, 22, 577 N.E.2d 1118. When damages can be computed to a fair degree of probability, they are not speculative. *Srail v. RJF Internatl. Corp.* (1998), 126 Ohio App.3d 689, 702, 711 N.E.2d 264.

{¶ 66} At trial, Allied's expert on the value of ballast, Robert Rimer, stated the price of ballast per ton in 1999, but was not certain of the price of ballast per ton in 1995. However, he did estimate the price would be between $6.00 and $7.25 per ton. Although this testimony clearly precludes the jury from calculating the amount of damages with mathematical certainty, it was not necessary for the jury to have done so. Rather, the jury must have been able to compute damages to a fair degree of probability. Allied's expert testimony was competent, credible evidence that gave the jury a basis upon which it could calculate damages. Moreover, the city presented no evidence rebutting Rimer's testimony. For example, had the jury used the amount of ballast more favorable to Allied and found 341,000 tons of ballast present on site, and used the lowest

end of Rimer's estimate, $6.00 per ton, then the jury's award could have been $46,000 more than what was actually awarded Allied.

{¶ 67} The jury's award of $2 million was supported by substantial competent, credible evidence. Thus, it was not against the manifest weight of the evidence, and the trial court abused its discretion when it granted a new trial on the issue of damages. Allied's third assignment of error is meritorious.

{¶ 68} In the event we reversed the trial court's grant of JNOV, the city asserted two conditional assignments of error as provided by R.C. 2505.22 and App.R. 3(C). In a civil suit, a party has no standing to cross appeal a final judgment on the merits in its favor but may advance an assignment of error as appellee to prevent reversal of the final judgment that was in its favor. *Seringetti Constr. Co. v. Cincinnati* (1988), 51 Ohio App.3d 1, 553 N.E.2d 1371. These rules allow an appellee who has not filed a notice of appeal from a trial court's decision to assign error to the trial court's actions. *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 2 OBR 704, 443 N.E.2d 184; *Parton v. Weilnau* (1959), 169 Ohio St. 145, 8 O.O.2d 134, 158 N.E.2d 719. Significantly, however, these errors may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment. Id. In other words, such assignments of error may be used only for the limited purpose of preventing the reversal of the judgment under review. *Chapman v. Ohio State Dental Bd.* (1986), 33 Ohio App.3d 324, 515 N.E.2d 992. Because we reverse the trial court's grant of JNOV and conditional grant of a new trial on damages, we may address the city's two conditional assignments of error.

{¶ 69} In its first conditional assignment of error, the city argues that the trial court abused its discretion by allowing Allied to amend its complaint after the presentation of evidence. Pursuant to Civ.R. 15(A), once an answer to a complaint is served, a party may amend a pleading only by leave of the court, which shall be freely given when justice so requires, or by written consent of the adverse party.

{¶ 70} "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues." Civ.R. 15(B).

{¶ 71} "As one court has noted, 'Rule 15 was promulgated to provide the maximum opportunity for each claim to be decided on its merits rather than

on procedural niceties.' " *Hall v. Bunn* (1984), 11 Ohio St.3d 118, 121, 11 OBR 417, 464 N.E.2d 516, quoting *Hardin v. Manitowoc–Forsythe Corp.* (C.A.10, 1982), 691 F.2d 449. "In considering a plaintiff's request for leave to amend, a trial court's 'primary consideration is whether there is actual prejudice to the defendants because of the delay.' " *Helman v. EPL Prolong, Inc.* (2000), 139 Ohio App.3d 231, 251, 743 N.E.2d 484, quoting *Schweizer v. Riverside Methodist Hosp.* (1996), 108 Ohio App.3d 539, 545, 671 N.E.2d 312.

{¶ 72} The city claims that it was actually prejudiced by Allied's delay in amending its complaint for two reasons. First, if it is denied the opportunity to plead a defense of immunity, then the court cannot allow Allied to plead a cause of action sounding in tort for the first time, and, second, it was required to present its case before the nature of Allied's claims was determined. Because we have held that the city was not immune, the city was not prejudiced by not being given a chance to plead that defense.

{¶ 73} The city's second claim, that it had to present its case before it knew the nature of Allied's claim, also does not establish actual prejudice because Allied pled conversion in its complaint. Civ.R. 8(A) sets forth the necessities for pleading a claim for relief and provides:

{¶ 74} "A pleading that sets forth a claim for relief * * * shall contain (1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled."

 {¶ 75} The purpose of Civ.R. 8(A) is to give the defendant fair notice of the claim and an opportunity to respond. *Fancher v. Fancher* (1982), 8 Ohio App.3d 79, 82–83, 8 OBR 111, 455 N.E.2d 1344. Civ.R. 8(A) does not require the plaintiff to plead the legal theory of recovery. *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 639 N.E.2d 771, paragraph six of the syllabus. Nor is the plaintiff " 'bound by any particular theory of a claim but that the facts of the claim as developed by the proof establish the right to relief.' " Id. at 526, 639 N.E.2d 771, quoting McCormac, Ohio Civil Rules Practice (2d Ed.1992) 102, Section 5.01. In other words, in order to survive a Civ.R. 12(B)(6) motion for failure to state a claim, it is sufficient that the facts of the complaint assert the elements of the claim even if the complaint does not state the theory of recovery. *Alexander v. Culp* (1997), 124 Ohio App.3d 13, 18, 705 N.E.2d 378, citing *Illinois Controls*.

 {¶ 76} "Conversion is a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Zacchini v. Scripps–Howard Broadcasting Co.* (1976), 47 Ohio St.2d 224, 226, 1 O.O.3d 129, 351 N.E.2d 454. The essential

elements of conversion are "plaintiff's ownership or interest in the property; plaintiff's actual or constructive possession or immediate right to possession of the property; defendant's wrongful interference with plaintiff's property rights; and damages." *Terrace Land Co., Inc. v. Kerrigan* (July 28, 2000), 7th Dist. No. 98 CA 217, at 4, 2000 WL 1114565, citing *Preston Trucking Co. v. Lindamood* (Oct. 19, 1987), 12th Dist. No. CA 86–12–076, 1987 WL 18758.

{¶ 77} In its complaint, Allied alleges that it owned the ballast, it had an immediate right to the ballast, the city wrongfully denied Allied's access to the ballast, and Allied suffered damages as a result of that wrongful action. Although it may not have specifically stated that it was proceeding under a conversion theory, this is not necessary under the Civil Rules concept of notice pleading. See *Illinois Controls,* supra. Thus, the city had notice of Allied's claim of conversion from the inception of the lawsuit and could not be prejudiced by an amendment to the complaint that made this claim more clear. The city's first conditional assignment of error is meritless.

{¶ 78} In its second conditional assignment of error, the city alleges that the trial court incorrectly instructed the jury on the law of conversion. However, as previously mentioned, conditional assignments of error may be used only as a shield to prevent the reversal of the judgment under review. The trial court in this case granted a JNOV in favor of the city. Therefore, the judgment the city has an interest in defending, or the judgment under review by this court, is the JNOV.

{¶ 79} The standard a trial court uses to rule on a JNOV motion, namely, that the court is to construe the evidence in the light most favorable to the nonmovant and find that a reasonable mind could come only to a conclusion adverse to the nonmovant, has nothing whatsoever to do with whether a jury instruction was correct or incorrect. Civ.R. 50(A)(4). Whether the instruction was erroneous or not is immaterial to a determination of whether the motion for JNOV should have been granted.

{¶ 80} Therefore, the city simply cannot defend the JNOV by claiming that the jury instructions were improper, given the fact that a JNOV, by its very nature, disregards the conclusion arrived at by the jury. Moreover, the city's argument that the jury instructions were erroneous is improper in the context of the limited scope of a conditional assignment of error. Consequently, we cannot use the alleged error as an alternative basis for affirming the trial court's decision to grant JNOV.

{¶ 81} Arguably, the city could use the improper-jury-instruction argument to shield the trial court's alternative judgment to grant a new trial on damages. However, that argument likewise fails, as the city would not be shielding the

decision of the trial court by asserting the jury instructions regarding conversion were erroneous. Rather, the city would be attacking the merits of the claim that is, again, impermissible in the context of a conditional assignment of error. More precisely, if we were to find the city's conditional assignment of error meritorious, we would have to remand for a new trial on the merits of the case instead of on damages. We conclude that the city's assignment of error does not support an affirmance of the trial court's judgment, and therefore it does not prevent reversal of the judgment. Therefore, we must find this assignment of error to be meritless.

{¶ 82} In conclusion, the trial court erred in granting JNOV because the city was engaged in a proprietary function when it told Allied that Allied could not take the ballast from the parcel. We also conclude that the trial court abused its discretion when it granted the city's motion for a new trial on damages because the damages could be calculated to a fair degree of probability. Finally, we conclude that neither of the city's conditional assignments of error provides an alternative basis for affirming the trial court's decision. Thus, we reverse the trial court's judgment and reinstate the jury's verdict in favor of Allied.

Judgment accordingly.

VUKOVICH, P.J., and GENE DONOFRIO, J., concur.