OPINION
{¶ 1} Plaintiff-appellant Rick Hugh, dba Rick Hugh Construction, appeals from the decision of the Monroe County Common Pleas Court granting judgment in favor of defendants-appellees Ronald and Rose Wills (the Wills) for $4,492.54. There are multiple issues raised in this appeal. However, the common thread running through the issues raised is whether the trial court's determination of damages was against the manifest weight of the evidence. For the reasons stated below, the judgment of the trial court is hereby affirmed.
 STATEMENT OF FACTS {¶ 2} On March 18, 2002, the Wills entered into a contract with Hugh, a residential log home builder, to build a log house on the Wills' real property located at 44303 Township Road 469, Woodsfield, Monroe County, Ohio. (Tr. 14-15, Exhibit A).[1]
The total cost to build the house was $150,059. Of that price, $51,540 was paid to Pariso Log Homes HHC, Inc. for the log home package. The remaining amount of $98,519 was the actual amount for construction of the home, which would be paid to Hugh. (Tr. 16, Exhibit A).
 {¶ 3} Hugh began working on the foundation in April 2002. (Tr. 114). The foundation for the house was completed around the end of May 2002. (Tr. 22). The log package arrived in early June 2002. (Tr. 113). Erection of the log house began in the first week of July 2002. (Tr. 22). The last day of labor for Hugh occurred on April 19, 2003. (Tr. 22).
 {¶ 4} Construction of the house moved slowly. Thus, the Wills, wanting to speed the process along, began hiring outside people to work on the house. For instance, the Wills purchased the carpet, even though the contract made an allowance of $2,006 for the carpet. (Tr. 123, Exhibit A). The Wills purchased the carpet in December, 2002, however, due to the house being unfinished, were unable to have it installed until April 25, 2003. (Tr. 123). Another example is the garage doors. (Tr. 126). The Wills had them installed by Dennis Miller. (Tr. 127). They were installed on February 14, 2003. (Exhibit 11). Perry Schumacher was additionally hired by the Wills to perform some plumbing and electrical work. (Tr. 88). Also, electrical work was performed by Mr. Wills during January, February, and March 2003.
 {¶ 5} From May 2002 through December 2002, the Wills made payments pursuant to the terms of the agreement. They paid him $86,123. However, they did not pay him the remaining $12,396 due on the contract.
 {¶ 6} On August 15, 2003, Hugh filed a complaint for foreclosure — Mechanic's Liens. The complaint alleged that the Wills owed him $11,640.18.[2] The Wills filed an answer and counterclaim on October 1, 2003. The counterclaim alleged that Hugh failed to timely perform and that the work was not done in a workmanlike manner. The Wills also alleged a third-party complaint against Pariso. This claim was later disposed of and is not subject to this appeal.
 {¶ 7} A bench trial occurred on February 15, 2005. At the conclusion of trial, each party was to submit post trial briefs instead of closing arguments. On June 8, 2005, the trial court issued its decision. The trial court found that Hugh failed to complete the contract within a reasonable time and, thus, was in breach of contract. Accordingly, it held that the Wills were entitled to damages. The damage amount for the breach of contract was determined by the court to be $10,402.09. (06/08/05 J.E.). This amount included $3,750 for travel expenses, $4,627.09 for the amount of mortgage interest paid by the Wills on the house from November 2002 to May 2003, $1,525 for the cost to repair the faulty footer drains, and $500 for the cost to fix the hole in the wall of the basement. (06/08/05 J.E.).
 {¶ 8} The court also found that the Wills were "entitled to credits and offsets against the claims of plaintiff in the amount of $6,486.45." (06/08/05 J.E.). This amount included the $1,105 cost for the garage doors, $1,008 for the cost of the garage floor, $2,008 for the cost of the carpeting, $901 for plumbing, $184 for electrical repairs done by Mr. Wills, $291.18 for the use of electricity by Hugh and his subcontractors, and $991.44 for the cost of propane to heat the house while construction was being completed.[3] It then stated:
 {¶ 9} "(iv). As the amount of credit and damages of Defendants [the Wills] properly offset any claim of Plaintiff [Hugh], Plaintiff's complaint and various claims therein are without merit and judgment is granted in favor of the defendants." (06/08/05 J.E.).
 {¶ 10} Consequently, the trial court determined that the Wills were entitled to $4,492.54.[4] Hugh timely appeals from that decision raising five assignments of error.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 11} "THE INCLUSION OF MORTGAGE INTEREST PAYMENTS AS A BREACH OF CONTRACT DAMAGE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN THAT THE CONTRACT IS SILENT ON A COMPLETION DATE AND THE COURT RELIED ON EVIDENCE EXCLUDED BY SUSTAINED OBJECTIONS."
 {¶ 12} "When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context." Snaderv. Job Master Services (2000), 136 Ohio App.3d 86, 89. Thus, this court must, when reviewing the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the verdict must be reversed and a new trial ordered. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52.
 {¶ 13} The judgment against Hugh for the breach of contract includes the Wills' mortgage interest charges from November 2002 to May 2003. This amounted to $4,627.09. Reimbursing the Wills for mortgage interest payments was based upon the fact that the house was not completed on time.
 {¶ 14} Hugh argues that the contract was completed in a timely fashion and, thus, the Wills are not entitled to the mortgage interest charges as damages. In support of this argument, he contends that the construction contract, the linear log contract, and the Pariso Log Home brochure are all silent on a completion date. He insists that since the construction agreement signed by the Wills and the lender, Farm Credit Services, indicates that construction is to be completed on April 19, 2003, the house was not untimely completed since it was completed by this date. While Hugh acknowledges that he did not sign this document, he contends that since his name is included as a contracting party and it references his contract between himself and the Wills, it is still evidence that the completion date for the house was April 19, 2003. Since he finished work on that date and since the Wills moved into the home on April 22, 2003, he contends that he performed within the time limits.
 {¶ 15} The trial court found that the Wills were led to believe that the house would be completed in four to six months. This was based upon representations made by Pariso and Hugh. The trial court also found that a reasonable time to complete a log home package of this type would be six months. This was based upon representations made by Pariso, Hugh and Perry Schumacher, a building contractor. Hugh claims that it was improper to rely on statements made by Pariso and Schumacher because these statements were excluded hearsay representations. Hugh is correct that representations made by Pariso concerning the time to build the house were stricken hearsay representations. (Tr. 109, 115).
 {¶ 16} However, as to Schumacher, the questioning was not concerning the building of log homes, but homes in general. The following is the colloquy that occurred:
 {¶ 17} "Q. Mr. Schumacher, you've indicated that you have built log homes. How long does it take to build a log home?
 {¶ 18} "A. It all depends on how many people you have. They're very time consuming.
 {¶ 19} "Mr. Range [counsel for Hugh]: I'm going to object, Your Honor. There was nothing in my cross examination concerning length of time.
 {¶ 20} "Mr. Morrison [counsel for the Wills]: Your Honor, counsel opened the door in terms of his experience —
 {¶ 21} "Mr. Range: Not on that issue.
 {¶ 22} "Mr. Morrison: — in terms of building log homes.
 {¶ 23} "The Court: I don't think so either. I'm going to sustain the objection.
 {¶ 24} "Q. (Counsel continuing): Mr. Schumacher, in terms of building a house in Monroe County, how long does it normally take?
 {¶ 25} "A. Then again, I mean, location, square areas of the house, ranch homes are a lot easier to build than a two story. A two story is easer to build than one that got hips and gables on it. I mean, it all — there's really no relative time.
 {¶ 26} "Q. Can a house be built in six months?
 {¶ 27} "A. It should be, yes.
 {¶ 28} "Q. And is that your experience with homes in this area?
 {¶ 29} "A. I've only seen a couple that took longer than that." (Tr. 101-102).
 {¶ 30} Thus, Schumacher's testimony indicates that homes in Monroe County are generally completed within six months. His testimony is not that a log house, like the one at issue, should only take six months to complete. The testimony is more general than that. Thus, for that reason the trial court should not have relied on Schumacher when it found that a log package of this type should reasonably take only six months to complete. However, this is not to say that the trial court lost its way when it found that the Wills were led to believe that the house would have been completed in six months and that six months is a reasonable time to complete a log house package.
 {¶ 31} First, testimony shows that the Wills were led to believe that their home would be completed in six months. The following testimony reveals this belief:
 {¶ 32} "Q. Again, Mr. Wills, forgetting about what anybody else said about completion of your home, when were you told by Mr. Hugh to expect completion of your home?
 {¶ 33} "A. He had said six months, but he had also told me in August to sell my house, the house I lived in, `cause this one would be done'.
 {¶ 34} "Q. All right. He told you six months to build your house?
 {¶ 35} "A. (No audible response).
 {¶ 36} "Q. Based upon that discussion, when did you believe your house would be completed?
 {¶ 37} "A. September or October." (Tr. 115-116).
 {¶ 38} Hugh argues that six months begins from July when he started to build the house. However, given the testimony, it is clear that the Wills believed that the six months started when Hugh was on the job site in April/May. Thus, six months from then would be the end of October, which as shown above is when Mr. Wills anticipated the completion of the house.
 {¶ 39} Second, the trial court's determination that six months to complete a log house package is reasonable is supported by the testimony of Hugh. He testified that he has been building log homes for 13 years. (Tr. 10). During that 13 year time span he had built Pariso log homes for 11 years. (Tr. 12). He testified that he has built between 30 to 50 log homes over those 11 years. (Tr. 12). Thus, if this testimony is believed, this means that he builds almost three log houses a year. Thus, using simple mathematics, a log home should be completed within six months. Furthermore, the record discloses that during the summer months nothing hindered Hugh from working on the house (the ground was not wet and messy until late fall). However, the record also reveals that during part of this time, he was not on the job site. Additionally, the record also discloses that during some of that time (summer dry months) nothing was being done on the house.
 {¶ 40} Considering that Hugh testified that the foundation was completed in May 2002, the trial court's determination that the log home should have been completed by the end of October 2002 was not against the weight of the evidence. While the loan document, which references Hugh's contract, does state that construction must be completed by April 19, 2003, the other evidence cited above indicates that the log home should have been completed within six months and that Hugh led the Wills to believe that their home would have been completed by October 2002.
 {¶ 41} Thus, given all the above, this court cannot find that the trial court lost its way in determining that the home was not completed in a timely manner. Consequently, the trial court's determination that Hugh breached the contract is supported by the evidence.
 {¶ 42} Furthermore, the trial court's grant of mortgage interest payments as damages for breach of contract are also not against the manifest weight of the evidence. The Wills were unable to live in the log home from November 2002 through April 2003 while construction was being completed. For that reason, they were unable to sell the house they were living in in Wadsworth. The sale of that house was intended to pay off the loan for the construction of the log house. Thus, requiring payment of mortgage interest payments was reasonable. In conclusion, this assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 43} "THERE WAS A FAILURE TO SUBSTANTIATE TIME AND TRAVEL
EXPENSES AND AS A RESULT, THE COURT ERRED WHEN IT INCLUDED THEM AS BREACH OF CONTRACT DAMAGES."
 {¶ 44} In awarding damages for breaching the contract, the trial court assessed the travel time and expense ($3,750) expended by Mr. Wills to complete the work Hugh was supposed to perform under the contract. The trial court concluded that Mr. Wills made at least 25 trips to Monroe County, Ohio from his home in Wadsworth, Ohio. The travel time was six hours and the cost of each trip was $150. Thus, the Wills expended $3,750 in travel expenses.
 {¶ 45} Hugh argues that in coming to this determination, the trial court relied on the sole testimony of Mr. Wills. Hugh asserts that since no other evidence, such as documentation, substantiated Mr. Wills' assertion that he made 25 trips to Monroe County and that it cost him $150 a trip, the Wills failed to meet their burden to prove this as damages.
 {¶ 46} "[T]he general measure of damages in a contract action is the amount necessary to place the nonbreaching party in the position he or she would have been in had the breaching party fully performed under the contract." Allied Erecting Dismantling Co., Inc. v. Youngstown, 151 Ohio App.3d 16, 31-32, 2002-Ohio-5179, citing F. Enterprises, Inc. v. Kentucky FriedChicken Corp. (1976), 47 Ohio St.2d 154, 159. Or, in other words, the proper measure of damages is the reasonable cost of placing the structure in the condition contemplated by the parties at the time they entered into the contract. See Hanselv. Creative Concrete Masonry Constr. Co., 148 Ohio App.3d 53,59, 2002-Ohio-198; Sites v. Moore (1992), 79 Ohio App.3d 694;Apple v. Water World, Inc., 8th Dist. No. 80823, 2002-Ohio-6326. As the court stated in Rasnick v. Tubbs (1998),126 Ohio App.3d 431, 437:
 {¶ 47} "Generally, a party injured by a breach of contract is entitled to his expectation interest, or `his interest in having the benefit of the bargain by being put in as good a position as he would have been in had the contract been performed.' Restatement of the Law 2d, Contracts (1981) 102-103, Section 344." See, also, Washington County Dept. of Job and FamilyServices v. Binegar, 4th Dist. No. 02CA42, 2003-Ohio-2855.
 {¶ 48} Mr. Wills testified that the time and money he spent coming to Monroe County was necessitated by Hugh's failure to complete the work under the contract. (Tr. 162). For instance, he explained that due to the time it was taking Hugh to finish the house, he had to go to Monroe County and find garage door suppliers and installers and to find people to lay the concrete in the garage. (Tr. 162-163). Had Hugh been working on the house, these actions would have been taken care of by Hugh and would not have required additional trips by Mr. Wills. Thus, Mr. Wills' testimony established that the $3,750 he expended for the 25 trips to Monroe County (spending $150 per trip), was a reasonable cost for placing the home in the condition contemplated by the parties when they entered the contract.
 {¶ 49} Hugh attempts to rebut that testimony by pointing to the fact that Mr. Wills only testified as to the number of trips and the cost of the trips and did not offer any documentation to prove his testimony. For several reasons, however, we conclude that Mr. Wills' sworn testimony is sufficient to prove the number of trips and the costs of the trips. First, since he is the one who made these trips he had personal knowledge as to the cost. Second, the trial court is in the best position to determine the credibility of witnesses. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80. Obviously, given the court's finding that the Wills were entitled to reimbursement for Mr. Wills' expenses for traveling to the log house numerous times, indicates that it found the testimony credible. Furthermore, given the amount of time to get from Wadsworth to Monroe County and given the number of items Mr. Wills arranged for completion (concrete for garage floor, laying of concrete, garage doors, carpeting, some plumbing, and some electric), we cannot state that the trial court unreasonably found the travel expenses were $3,750.
 {¶ 50} Consequently, the trial court's award of $3,750 was not against the manifest weight of the evidence. This assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 51} "THE SET OFF OF PROPANE COSTS AGAINST THE CONTRACT PRICE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 52} Under this two paragraph argument, Hugh argues that the trial court's determination that the entire cost of the propane ($991.44) was to be set off against the contract price, was against the manifest weight of the evidence. During the winter months (November and on) before the log house was completed, Mr. Wills was informed that the house would need to be heated to ensure that the wood inside the house would not be damaged.
 {¶ 53} It is undisputed that the construction contract is silent as to who would pay for the cost of the propane. Hugh testified that he had an agreement with the Wills that they would split the cost of the heating. (Tr. 56, 75, 76, 245). Mr. Wills testified that he never agreed to pay for any of it and that Hugh agreed to pay for all of it. (Tr. 135-138).
 {¶ 54} Thus, given that there is conflicting testimony as to what was agreed, the trial court had to make this determination. As aforementioned, the trial court is in the best position to analyze the witnesses and determine their credibility. SeasonsCoal Co., 10 Ohio St.3d at 80. There is nothing in the record to support the conclusion that Mr. Wills' testimony was not competent, credible testimony. Thus, this court cannot find that the trial court did not commit error when it held that the total price of the propane was an offset to the contract price, i.e. Hugh agreed to pay for the total cost of propane.
 {¶ 55} Hugh also argues that heat was necessary whether or not the Wills were living in the home since cold weather was potentially damaging to the wood. However, as explained earlier, the trial court found that the house should have been completed prior to November, which is when the heat was needed. Had it been completed, there would not have been an issue as to heat. Furthermore, this argument has no impact on what the parties agreed to. Since the trial court found that Hugh agreed to pay the amount of the total cost of heating, it obviously believed Mr. Wills' testimony over that of Hugh's. Thus, for all the above reasons, this assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 56} "THE CONSTRUCTION CONTRACT IS SILENT AS OF THE PAYMENT OF ELECTRICAL SERVICE AND THE COURT ERRED IN SETTING IT OFF AGAINST THE CONTRACT PRICE IN ITS DAMAGE CALCULATIONS."
 {¶ 57} Like the cost of propane, the trial court also found that the cost of the electrical service prior to the Wills' occupation of the home was a set off against the contract price. In a one paragraph argument, Hugh's contends that this amounted to error.
 {¶ 58} It is undisputed that the construction contract required the Wills to provide electrical service to the outside of the house. However, the contract is silent as to the payment for electricity used during construction.
 {¶ 59} In finding that the cost of electricity would be a set off to the contract price, the trial court stated:
 {¶ 60} "The contract required Defendant [the Wills] to have electrical service run to the job place. It is the responsibility of the contractor to pay all electrical service fees used by him or his subcontractors. Defendants are entitled to a set off against the contract price for $291.18." (06/08/05 J.E.).
 {¶ 61} At trial Mr. Wills testified that Hugh was required to pay the electric. (Tr. 138, 201-202). Hugh, on the other hand, testified that the Wills were required to pay the electric. (Tr. 253-254). Other than that, there is no testimony concerning whose obligation it is to pay for the electric service (such as what is the standard practice in construction).
 {¶ 62} Given the testimony presented and the lack of any other evidence to show that the trial court erred in concluding as it did, this court must give deference to the trial court's determination that the electricity used during construction was to be paid by Hugh. As such, this assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 63} "THE COURT ERRED IN AWARDING BREACH OF CONTRACT DAMAGES FOR IMPROPERLY INSTALLED FOOTER DRAINS AS THE EVIDENCE WAS INSUFFICIENT TO CONNECT BASEMENT DAMPNESS TO THEIR INSTALLATION, NOR WAS THERE EXPERT TESTIMONY TO SUBSTANTIATE DAMAGES."
 {¶ 64} In the trial court's award for damages on the Wills' breach of contract claim, the trial court awarded $1,525 for the repair of footer drains. In its judgment, it stated the following concerning the drains:
 {¶ 65} "Following completion of the home, the Defendants [the Wills] have sustained numerous instances of dampness and water in their basement. The cause of this dampness results from the failure of the contractor to properly install drainage lines and to install gravel around the foundation drains. The cost to repair the improperly installed drain is $1,525.00. This cost is fair and reasonable and is a direct result of the breach of contract of Plaintiff, Rick Hugh." (06/08/05 J.E.).
 {¶ 66} Hugh argues that the trial court erred when it awarded damages for two reasons. First, he contends the trial court improperly relied on Mr. Wills' testimony as an expert to explain what needed to be done and why the basement experienced dampness and leaks. Second, he contends that there is no casual connection between the alleged improper installation of the footer drains and the basement dampness.
 {¶ 67} Concerning the first argument, Hugh is claiming that Mr. Wills is not qualified to testify as an expert and that his testimony amounted to and was relied upon as expert testimony. At trial, Mr. Wills testified that even though his house sits at the top of a hill, when it rains his house experiences a damp or wet basement. (Tr. 143-144). He explained what was needed to repair it during the following dialog:
 {¶ 68} "Q. At my request, have you made a calculation in terms of cost of repair necessary to correct the problem?
 {¶ 69} "A. Yes, I have.
 {¶ 70} "Q. And what have you determined, sir?
 {¶ 71} "A. Well, it would require taking — there's an open deck along the house and the mud room, you'd have to take those boards off and dig down by hand, you can't get a machine in there, along the foundation, and replace the pipe and put gravel over it, so it will work. So the water can get to the pipe and run away." (Tr. 143).
 {¶ 72} At this point an objection was lodged by Hugh asserting that Mr. Wills was not qualified to testify as an expert. The trial court overruled the objection. (Tr. 144). Mr. Wills continued to testify and explained that he priced the pipes and gravel and it would cost $1,525 to properly install the footer drains. (Tr. 144).
 {¶ 73} It is unclear whether the trial court overruled the objection on the basis that Mr. Wills was qualified to testify as an expert under Evid.R. 702 or whether his testimony was admissible as opinion testimony by a lay witness under Evid.R. 701. However, given the information provided by Mr. Wills, we find that his testimony falls under Evid.R. 701 as opinion testimony by a lay witness, and thus, is admissible. This rule provides as follows:
 {¶ 74} "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.
 {¶ 75} "In Lee v. Baldwin (1987), 35 Ohio App.3d 47, 49, the First District Court of Appeals explained that lay testimony must be, `(1) "rationally based on the perception of the witness," i.e., the witness must have firsthand knowledge of the subject of his testimony and the opinion must be one that a rational person would form on the basis of the observed facts; and (2) "helpful," i.e., it must aid the trier of fact in understanding the testimony of the witness or in determining a fact in issue.'" Alliance v. Yin, 5th Dist. No. 2004CA00239,2005-Ohio-2989, ¶ 31.
 {¶ 76} The first factor of this test is met. Mr. Wills had first hand knowledge of the subject of his testimony. Mr. Wills testified that from the very beginning they had problems with the footer drain. (Tr. 139). He explained that he talked to Hugh and Hugh dug out the mud around the drains by hand, put the pipe back in place, and placed gravel around it. (Tr. 140). Mr. Wills then added that the parts that he did not see Hugh finish digging up is where the water problem is now. (Tr. 140). Mr. Wills watched Hugh do the work on the footer drain. Therefore, his observations made him aware of what was needed to correct the remaining footer drain problems. Thus, the first factor was met.
 {¶ 77} Furthermore, the second factor was also met. The testimony was helpful to aid the trier of fact, i.e. the court, in determining a fact at issue.
 {¶ 78} Consequently, considering all the above, Mr. Wills' testimony fell under Evid.R. 701. Thus, the trial court did not abuse its discretion in allowing the testimony.
 {¶ 79} The second argument made by Hugh under this assignment of error is that there was never an established causal connection between the alleged improper installation of the footer drains and the basement dampness. This argument is meritless based upon Hugh's own testimony.
 {¶ 80} "The Court: If it was drained properly on the outside, why would it be wet?
 {¶ 81} "The Witness: I honestly don't understand what the problem is, but I do know that I put pipe and gravel in there.
 {¶ 82} "The Court: All right. But isn't that the whole purpose of the pipe and the gravel and the tar —
 {¶ 83} "The Witness: Yes.
 {¶ 84} "The Court: — and everything else to make sure that a basement doesn't leak?
 {¶ 85} "The Witness: Yes.
 {¶ 86} "The Court: And if the basement does leak, since it's probably not leaking from the inside, or they'd have a swimming pool, it's probably leaking from the outside, so there's probably something wrong with the way that was installed?
 {¶ 87} "The Witness: Either that or the water is getting in above the tar line?
 {¶ 88} "The Court: Yeah, but in looking at the pictures that isn't really what's happening there either?
 {¶ 89} "The Witness: No.
 {¶ 90} "The Court: I mean, you don't think that's what happening there either?
 {¶ 91} "The Witness: No." (Tr. 264-165).
 {¶ 92} Thus, his own testimony establishes that since it is not coming in above the tar line, then the dampness and wetness is coming from improperly installed drains. Consequently, this argument lacks merit.
 {¶ 93} Thus, the trial court's determination that the Wills were entitled to $1,525 for improperly installed drains, was not against the manifest weight of the evidence. This assignment of error is without merit.
 {¶ 94} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.
[1] The trial court's judgment indicates that the contract was entered into on March 18, 2003. Given other dates in the journal entry, testimony, and exhibits, it can be determined that the 2003 number was a typographical error that should be 2002.
[2] The difference between the amount remaining on the contract and the amount requested in the complaint for foreclosure was due to a credit the Wills received for having some of the work performed by outside people.
[3] When adding these numbers together the amount is $6,486.62, not $6,486.45 that was awarded to the Wills. The amount is off by $0.17.
[4] This represents credit and damages of $16,888.54 minus the $12,396 due on the contract.