[Cite as *Zimmerview Dairy Farms, L.L.C. v. Protege Energy III., L.L.C.*, 2022-Ohio-1282.]

# IN THE COURT OF APPEALS OF OHIO
## FOURTH APPELLATE DISTRICT
### WASHINGTON COUNTY

|  |  |  |
|---|---|---|
| ZIMMERVIEW DAIRY FARMS, LLC, ET AL., | : | |
| | : | Case No. 21CA1 |
| Plaintiffs-Appellees, | : | |
| | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| PROTÉGÉ ENERGY III LLC, | : | |
| | : | |
| Defendant-Appellant. | : | |

_____

## APPEARANCES:

J. Kevin West, Dallas F. Kratzer, III, Steptoe & Johnson PLLC, Columbus, Ohio, Robert L. Paddock, Buck Keenan LLP, Houston, Texas, Pro Hac Vice, for Appellant.

Matthew C. Carlisle, Adam J. Schwendeman, Thiesen Brock, LPA, Marietta, Ohio, for Appellees.

_____

Smith, P.J.

{¶1} Defendant-Appellant Protégé Energy III LLC, "Protégé," appeals the December 18, 2020 Decision and Judgment Entry of the Washington County Court of Common Pleas. Protégé conducted gas and oil operations on property owned by Plaintiffs-Appellees Zimmerview Dairy Farms, LLC and Zimmerview Properties, LLC, collectively "Zimmerview,"

in 2015.  Later, Zimmerview brought various claims against Protégé, including breach of contract, conversion, and trespass.

{¶2} After a bench trial, the trial court found in favor of Zimmerview and awarded Zimmerview $819,093.00 on the above claims.  Protégé challenges the trial court's findings on Zimmerview's claims and the damage awards.  However, based upon basic principles of contract law in Ohio and our review of the evidence presented at trial, we find no merit to the arguments offered in Protégé's five assignments of error.  We find there is competent and credible evidence to support the trial court's judgment in this matter.  Accordingly, we overrule all assignments of error and affirm the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶3} The following facts were adduced at a bench trial in the Washington County Court of Common Pleas on September 29, 2020.  Dean Zimmer and his brother Brent Zimmer are the members of Zimmerview Dairy Farm, LLC.  Zimmerview owns land and maintains a farming operation at 700 Zimmer Road in Washington County.  The farm has been in the Zimmer family since 1926.  Dean Zimmer has worked the family farm his entire life, and before that, his father and grandfather worked and managed the farm.  The farm started out as a dairy farm, switched to beef,

and currently is a beef-feeding operation.  The Zimmers grow corn, soybeans, hay, and alfalfa.

{¶4} In January 2014, Dean Zimmer, on behalf of Zimmerview, and MNW Energy LLC, entered into an Oil and Gas Lease.  James Vuksic, who testified at trial, owned shares in MNW Energy LLC.  The Oil and Gas Lease was eventually assigned to Protégé.

{¶5} Tarah Fagan represented Protégé's interests in the subsequent contract negotiations.  Due to difficulty in the negotiations, Dean Zimmer asked James Vuksic to mediate the contract negotiations.  Vuksic had assisted Protégé with negotiations in the past.  Vuksic has been involved in the oil and gas industry for 30 to 40 years.  In addition to the original Oil and Gas Lease, the parties eventually entered into three additional contracts:

1.  The Supplemental Agreement of the Parties;

2.  The Surface and Subsurface Use Agreement[1]; and,

3.  The Damage Release Agreement.

The above four contracts were admitted as joint exhibits at trial.  Additional information regarding the pertinent contract negotiations will be set forth below.

---

[1]Testimony indicates the Surface and Subsurface Use Agreements simply provided for an easement to construct the well pad on the Zimmerview property.

{¶6} Protégé used 13.5 acres of the Zimmer farm during construction of what became known as the Caywood well pad, five for the well pad and 8.5 for the hillside. Core drilling began in January 2015. Brush and tree removal began in March 2015. Fences were constructed in April 2015. Topsoil removal began in May 2015. Huge trucks moved the topsoil to a stockpile at an agreed-upon location.

{¶7} In June 2015, there were multiple extremely heavy rains. Dean Zimmer identified a photo exhibit showing the extreme runoff of brown water which took topsoil with it. The topsoil ran into a creek which bordered the Zimmer farm. Dean Zimmer identified several photographs which showed how the hillside looked after every rain with the topsoil stockpile running downhill.

{¶8} Protégé hired Great Lakes Construction Company, "Great Lakes," to re-seed the area. However, the rains washed the seed away and gullies formed. During these efforts, topsoil was not replaced. The topsoil continued to flow downhill. There were three initial attempts to re-seed the hillside.[2] Each time the rains washed the seed away and gullies formed.

---

[2]Protégé witness Brian Plautz testified that hydroseeding is the process of applying grass seed and fertilizer mixed together with water to slopes using a truck.

{¶9} Mr. Zimmer and his brother spoke to Protégé's CEO about their concerns in August 2015. Great Lakes left the site in early fall 2015, leaving some gullies behind. Within a month or two, Zimmer testified there were four-foot canyons and gullies running through the hillside. Zimmer also testified that large boulders were left behind.

{¶10} The Zimmers also contacted the Ohio Department of Natural Resources, "ODNR." ODNR inspected the well pad area and issued a notice to Protégé that they needed to reclaim the area.[3] On the fourth attempt at reclamation, Protégé used a company called Hydrogreen.

{¶11} Hydrogreen repositioned some of the boulders and moved them into piles. Hydrogreen "tracked" the rough spots in the gullies and sprayed the hillside again. Hydrogreen left in June 2016. After the first rain, the gullies reappeared even deeper. Zimmer testified that gullies create problems in farming because animals can get hurt and because it is dangerous to use farm or heavy equipment near gullies.

---

[3]Oil and gas reclamation begin long before the completion of operations at an oil and gas site. Rather it is an ongoing process, beginning before site construction and continuing through the life of an oil and gas production well and its associated facilities. Following reclamation, an inspector checks for proper re-contouring of the site, the return of topsoil to disturbed areas, and completion of proper re-seeding. Reclamation is successful when it has established a self-sustaining, vigorous, diverse, native plant community that will control erosion and non-native plant invasion. *See* U.S.Department of the Interior, Bureau of Land Management, Reclamation. https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/reclamation. Accessed December 14, 2021.

{¶12} When Protégé left the jobsite, erosion and landscaping issues still existed.[4] Protégé left parts of fence behind. Both water and telephone lines were exposed. There was unsightly vegetation. Mr. Zimmer described the well pad area as an "inconvenience and an eyesore."

{¶13} Zimmer testified he had to remove a three-strand fence placed by the contractors. When cattle attempted to go through the fence they were injured. Zimmer testified the water line was exposed four to five hundred feet. Prior to the construction, Zimmer never had Marestail, "an invasive weed that spreads extremely fast." He testified the weeds do not hold the topsoil. Zimmer testified the property was not usable for farming.

{¶14} Through their attorney, the Zimmers made Protégé aware of the issues with the condition of the property. Protégé sent Dean Zimmer a check but Zimmer was advised to send it back. Subsequently, Zimmerview filed its complaint against Great Lakes and Protégé for breach of contract, conversion, trespass, additional trespasses, and misappropriation of images and intellectual property on September 20, 2018. Protégé filed an Answer denying all claims.[5]

---

[4]One of Protégé's witnesses, Benjamin Wright, testified that water running across bare soil causes it to move or "erode." A "slip" is when water saturates a slope to the point that the soil becomes too heavy to stay on a slope and then a large chunk of soil breaks off the slope.

[5]Great Lakes was later dismissed from the action. Furthermore, the claims for additional trespasses, misappropriation of images and intellectual property were also dismissed.

{¶15} Protégé filed a motion for summary judgment which was denied.[6] The parties proceeded to a bench trial on September 29, 2020. Zimmerview presented the in-person testimony of several witnesses: Dean Zimmer, James Vuksic, William "Billy" H. Burkhart II, and Larry Lang. As indicated above, the contracts the parties entered were stipulated as joint exhibits. In addition, Zimmerview offered Exhibits 1-55 into evidence. Protégé did not oppose the admission of these exhibits. The 55 exhibits included letters to Protégé; photographs of invasive weeds after the Hydroseed application in 2016; photographs of the Zimmer property in January and September 2020; estimates provided by Billy Burkhart and Larry Lang; a photograph of the topsoil stockpile; and Dean Zimmer's out of pocket expenses.

{¶16} Protégé did not present witnesses in person at trial, but instead relied on depositions of the following persons: Jason Pugh, Brian Plautz, Benjamin Wright, and Tarah Fagen.[7] Jason Pugh is a petroleum engineer.

---

[6]Zimmerview also filed a motion to join an additional party, Verdun Oil Company, LLC, under Civ.R. 19, a motion which the trial court granted. However, the record does not reflect that Verdun was subsequently served and made a party to the proceedings. In *State e x rel. Gill v. Winters*, 68 Ohio App.3d 497, 589 N.E.2d 68, 73, (4th Dist.1990), this court noted that pursuant to Civ.R. 19(A), the trial court is "vested with a substantial amount of discretion in determining whether a party is necessary in the sense that in his absence complete relief cannot be afforded among those already parties." This court further emphasized the mandatory language of Civ. R. 19(A). The docket in this case demonstrates that Verdun Oil Company, LLC was never served and made a party. Neither party has addressed this on appeal. In *Gill,* this court also pointed out that joinder may be waived. Given that Zimmerview has not addressed this issue, we conclude the failure to join Verdun Oil Company, LLC, as ordered by the trial court, has apparently been waived.

[7]Tarah Fagen's deposition was a discovery deposition while the others were evidentiary depositions. As observed by the appellate court in the 10th district, we are cognizant that Civ.R. 32, which governs the use

He was previously employed by Protégé as operations manager.  He was responsible for gas production, operations, oil and gas well completion, and any kind of surface construction that was required for oil and gas operations.

{¶17} Pugh testified that when Great Lakes excavated the hillside, boulders "popped out."  The workers tried to break them up into smaller pieces and make them part of the material.  Some were removed to a particular area on the site at Mr. Zimmer's direction.  Protégé also repaired erosions and "slips,"[8] the main issues relating to the well pad.  Protégé monitored and fixed these issues as needed.  These issues were expected surface and subsurface damages.

{¶18} Brian Plautz holds a degree in civil engineering.  He was project manager for Great Lakes Construction Company.  Plautz's job entailed controlling the documentation and financial aspects of the project. Plautz testified he was familiar with oil and gas operations at Zimmerview. He visited the construction site once every two weeks.  He testified that at the end of Great Lakes' work, there were no extraordinary or unusual issues with erosions or slips, re-planting or re-seeding, or rocks and boulders.

---

of depositions, does not distinguish between discovery depositions and evidentiary depositions. *See Fifth Third Bank of Columbus v. Margolis Family Ltd. Partnership,* 10th Dist. Franklin No. 97APE-05-693, 1997 WL 770966, at *4.  "However, where * * * the credibility of the witness is a vital factor, the use of a pretrial discovery deposition 'is an inadequate substitute for the presence of that witness.' " *Id*. quoting *Loinez v. E.G. & G., Inc.* (C.A.1 1990), 910 F.2d 1, 8.

[8]Pugh testified a slip is where an embankment fails and the material of the embankment becomes dislodged because of a weak point.

Furthermore, neither Protégé nor Zimmerview informed Great Lakes that they were not satisfied with Great Lakes' work.

{¶19} Benjamin Wright holds degrees in environmental science and watershed management. He is owner and manager of Hydrogreen. Wright testified he was familiar with aspects of the oil and gas operations at Zimmerview. However, he was on the site only twice.

{¶20} Tarah Fagen testified she holds a degree in energy management and finance from the University of Oklahoma. Ms. Fagen is vice president of land for Protégé. Fagen testified she manages the leasing negotiations, pre-drilling, and title work. She also handles land owner complaints relating to ongoing operations. Fagen testified she worked with a team which included Jason Pugh. Fagen was familiar with the Zimmer well pad.

{¶21} After hearing the evidence presented by the parties, the trial court granted judgment in favor of Zimmerview and against Protégé on the breach of contract, conversion, and trespass claims. On the breach of contract claim for failing to properly reclamate the Zimmer property, the trial court awarded damages in the amount of $349,093.00. On the claim for conversion of topsoil, the trial court awarded $450,000.00. On the claim for breach of contract/trespass relating to the Zimmers' lack of access to their

property, the court awarded $20,000.00. This timely appeal followed.

Additional facts will be set forth where pertinent.

ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT ERRED BY FINDING
        PROTÉGÉ HAD A CONTINUING DUTY TO
        REMEDY DAMAGES THAT WAS NOT PART
        OF THE PARTIES' AGREEMENTS.

II.     THE TRIAL COURT ERRED BY GIVING
        "CLEAN-UP        OPERATIONS"        AND
        "EXTRAORDINARY         OR      UNUSUAL"
        DAMAGES DEFINITIONS THAT RENDERED
        OTHER     PARTS     OF    THE    PARTIES'
        AGREEMENTS MEANINGLESS.

III.    THE TRIAL COURT ERRED IN FINDING FOR
        ZIMMERVIEW     ON    ITS    BREACH    OF
        CONTRACT AND CONVERSION CLAIMS
        RELATED TO TOPSOIL.

IV.     THE TRIAL COURT ERRED IN DETERMINING
        THE AMOUNT OF DAMAGES TO AWARD
        ZIMMERVIEW BECAUSE IT DID NOT APPLY
        THE PROPER MEASURE OF DAMAGES AND
        RELIED ON SPECULATION.

V.      THE TRIAL COURT ERRED BY FINDING
        PROTÉGÉ HAD BREACHED ITS AGREEMENT
        WITH ZIMMERVIEW BY FAILING TO PAY
        ADDITIONAL RENTS, BY IGNORING THE
        PLAIN LANGUAGE OF THE AGREEMENT
        AND RELYING ON EXTRINSIC EVIDENCE.

STANDARD OF REVIEW FOR
CONTRACT INTERPRETATION

{¶22} This appeal involves questions regarding interpretation of the contracts which governed the relationship and work of the parties. Legal issues involving contract interpretation are subject to a de novo standard of review. *See S. P. Drilling Services Inc. v. Cooper Excavating, LLC,* 4th Dist. Adams No. 17CA1058, 2019-Ohio-55, at ¶ 14; *Taylor Bldg. Corp. of Am. v. Benfield,* 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 37. *See also Wiltberger v. Davis,* 110 Ohio App.3d 46, 51-52, 673 N.E.2d 628 (1996).

{¶23} Further, when a trial court makes factual findings supporting its legal conclusions regarding a contract, those factual findings must be reviewed with great deference and upheld if some competent credible evidence exists to support them. *See S.P. Drilling Services Inc.* at ¶ 14; *Taylor* at ¶ 38, and *Wiltberger* at ¶ 52. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *GM Gas Exploration, Inc. v McClain,* 4th Dist. Athens No. 1438, 1991 WL 163644 (Aug. 13, 1991), at *2. In our review, we look to see if the facts and the resulting judgment are both supported by the weight of the evidence. *Patton v. Patton,* 4th Dist.

Adams No. 01CA712, 2001-Ohio-2599, *2.  Furthermore, appellate courts

will not reverse judgments as being against the weight of the evidence when

those judgments are supported by some competent and credible evidence.

*Id*. (internal citations omitted).

>    I.      THE TRIAL COURT ERRED BY FINDING PROTÉGÉ
>            HAD A CONTINUING DUTY TO REMEDY
>            DAMAGES THAT WAS NOT PART OF THE
>            PARTIES' AGREEMENTS.
>
>    II.     THE TRIAL COURT ERRED BY GIVING "CLEAN-UP
>            OPERATIONS" AND "EXTRAORDINARY OR
>            UNUSUAL" DAMAGES DEFINITIONS THAT
>            RENDERED OTHER PARTS OF THE PARTIES'
>            AGREEMENTS MEANINGLESS.

### LEGAL ANALYSIS

**{¶24}** Because we find these assignments of error to be interrelated,

we consider them jointly.  The trial court found that Protégé had a

continuing duty to fix and repair gully and erosion issues.  The court further

determined that cleanup operations encompassed activities which occurred

in the process of returning the land to Zimmerview in a similar condition as

it was prior to construction, and that the failures in cleanup operations led to

the current damaged state of the property.  Thus, the court awarded

judgment in favor of Zimmerview and against Protégé in the amount of

$349,093.00, plus interest, due to Protégé's breach of contract for failure to

properly reclamate and return the property to Zimmerview in a similar condition as prior to construction of the well pad.

{¶25} Under the first assignment of error, Protégé contends that neither the Oil and Gas Lease, nor the Damage Release Agreement contain provisions creating a continuing duty to correct erosion issues. Protégé asserts that the trial court went outside of the plain language of the agreements to "invent" a continuing duty to remedy damages caused to the Zimmerview property. According to Protégé, the trial court then concluded that Protégé had breached its agreements with Zimmerview by failing to fulfill the "newly-invented duty." Protégé asserts the trial court thereby erred as a matter of law.

{¶26} Under the second assignment of error, Protégé argues that the trial court erred with regard to its interpretation of "cleanup operations" and "extraordinary" or "unusual" damage, as contained in the Damage Release Agreement. At trial, Zimmerview argued that Protégé failed to clean up the property after it concluded oil and gas operations and that the remaining damages were "extraordinary or unusual." Protégé contends that the trial court erred by its interpretation of "extraordinary or unusual," and then by relating these terms to the trial court's "newly-created duty." Protégé argues that this court should find that Zimmerview is not entitled to damages under

the "clean-up operations" and "extraordinary or unusual" provisions of the Damage Release Agreement.

{¶27} " 'In construing a written instrument, the primary and paramount objective is to ascertain the intent of the parties so as to give effect to that intent.' " *Lang, supra,* at ¶ 17, quoting *Shafer v. Newman Ins. Agency,* 4th Dist. Highland No. 12CA11, 2013-Ohio-885, at ¶ 10, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). " 'When the terms of a contract are unambiguous, courts will not, in effect, create a new contract by finding an intent not expressed in the clear language employed by the parties.' " *Waina v. Abdallah,* 8th Dist. Cuyahoga No. 86629, 2006-Ohio-2090, at ¶ 31, quoting *Shifrin v. Forest City Ents.,* 64 Ohio St.3d 635, 597 N.E.2d 499 (1992). " 'Courts must give common words their ordinary meaning unless manifest absurdity would result or some other meaning is clearly evidenced from the face or overall contents of the written instrument.' " *Shafer* at ¶ 10, quoting *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, 821 N.E.2d 159, ¶ 29.

{¶28} " 'If a contract is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations; instead, the court must give effect to the agreement's

express terms.' " *Lang, supra,* at ¶ 18, quoting *Uebelacker v. Cincom Sys., Inc.,* 48 Ohio App.3d 268, 271, 549 N.E.2d 1210 (1st Dist.1988). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller–Gonzalez,* 120 Ohio St.3d 47, 2008-Ohio-4838, 896 N.E.2d 666, ¶ 16. "Extrinsic evidence is admissible to ascertain the intent of the parties only when the contract is unclear or ambiguous, or where surrounding circumstances give plain language special meaning." *Highland Drilling, Inc. v. McAlester Fuel Co.,* 4th Dist. Washington No. 99CA08, 1999 WL 1058785, *3 (Nov. 16, 1999).

{¶29} As indicated, the trial court specifically found a continuing duty to repair the erosion issues on the Zimmerview property. Paragraph 31 of the Oil and Gas Lease provides:

> Surface Restoration: Removal of Lessee's Property. Lessee shall construct or install all well sites, access roads, pipelines, structures and other facilities, in a manner that would reasonably minimize any related soil erosion. Should Lessee materially damage any part of the surface, * * *, *it is expressly agreed and understood that Lessee shall use commercially reasonable efforts to repair and restore such damaged portion of the surface of the Leased Premises as nearly as practicable to the condition in which said land existed before the commencement of operations within one hundred eighty (180) days after well completion or pipeline installation.* (Emphasis added.) * * * All restoration work shall be done at the sole expense of Lessee.

{¶30} Paragraph Five of the Damage Release Agreement

provides:

> Grantor does hereby discharge and release Grantee, * * *, from all actions, causes of actions, suits, claims and demands whatsoever for and on account of any damages to the appurtenances to the Property or to growing crops or timber thereon; for and on account of any interference with livestock operations caused by or as a result of Grantee's exploration and drilling for and operation and production of oil and gas and related substances; and any surface and subsurface damages caused by or incurred in connection with the construction of the [well pad at issue].

{¶31} In response to the first assignment of error, Zimmerview asserts that the Oil and Gas Lease is ambiguous as to Protégé's agreement to restore the property using commercially reasonable efforts. Therefore, the trial court did not err when it admitted extrinsic evidence and, based on the evidence, found a continuing duty to repair the property. For the reasons which follow, we agree with Zimmerview.

{¶32} We start by examining the testimony the trial court heard on the above issues. Dean Zimmer testified that shortly after the Oil and Gas Lease was signed Protégé wanted to put a well pad on his property so discussions ensued. Zimmer insisted on a Supplemental Agreement because he did not want the well pad on his property. Zimmer testified that initially the parties could not agree where the well pad was to be located. He later agreed to the requested location with multiple stipulations because the location was "in

the middle of good property," and very close to Zimmer's personal residence.

{¶33} Dean Zimmer also testified that early on negotiations "broke down" with Protégé's representative, Tarah Fagan. Zimmer asked James Vuksic to mediate. Mr. Zimmer testified at length as to his expectations that the Zimmerview property would be fully restored after the well pad was constructed. Mr. Zimmer testified:

> The number one agreement we - - stressed very strongly from day one, was we want it to look nice and be able to go back and be able to farm like it was before, and after the well had - - you know, was finished. Our family, neighbors, whatever, I think kind of everybody in the area takes pride in the looks of our farm, and we do too, and we work hard at it. And we didn't want the well to be an eyesore.

{¶34} Mr. Zimmer testified the land around the pad never had erosion issues or water drainage issues before the pad construction. There were no issues with invasive vegetation. He testified, "It was lush grass, pasture. * * * And it was very fertile."

{¶35} Mr. Zimmer testified that the landscaping was the subject of Paragraph 11 of the Oil and Gas Lease. He requested that trees be planted to block the view of the well pad and tanks. Mr. Zimmer reiterated, "[W]e wanted it returned to look good and be farming and usable, very usable property."

{¶36} Mr. Zimmer testified he does not like looking at the well pad outside his back window. He is no longer able to use the five acres where the well pad is located. Rocks and boulders were left in the area after construction ceased.

{¶37} Jason Pugh, Protégé's project manager at the time, testified he was familiar with the Oil and Gas Lease between Protégé and Zimmerview. Pugh testified that he "provided limited input on certain terms but did not negotiate" the Oil and Gas Lease, the Supplemental Agreement, the Surface Use Agreement, and the Damage Release Agreement. He testified his role was to "opine to our land department about the terms we could and couldn't agree to." Pugh identified the Damage Release Agreement and testified that this agreement released Protégé from damages incurred as a result of oil and gas operations on the site. The Damage Release Agreement did not stipulate any particular work to be performed.

{¶38} Generally, Pugh testified that Protégé agreed to restore the slopes on the Zimmerview property as part of the Supplemental Agreement, and that Protégé had fulfilled this requirement. He identified the final as-built survey performed by Great Lakes after construction was substantially completed. He testified the slopes conformed with what Protégé agreed to do and there were no unusual issues.

{¶39} Pugh testified that after the construction was complete, Protégé "continued to maintain any instances of erosion * * * until the site was completely vegetated and re-seeded." Pugh also identified the Daily Reports prepared by the construction inspector. The reports documented erosions located on the property and recorded efforts to mitigate and manage the erosions until the construction was complete. Pugh testified that the reports reflected that re-seeding and re-planting was performed as required.

{¶40} Pugh testified there are unique aspects about every job and well pad. In this case, it took several re-seeding attempts to get the grass to grow. He explained that a bare hillside exposed to weather conditions is more susceptible to erosion.

{¶41} Pugh also identified a notice from the ODNR regarding erosion issues that needed remedied. Pugh testified they repaired the issues as required. Great Lakes used Penn Line twice to do the re-seeding. The first seeding in July 2015 did not establish well so Penn Line returned, as a warranty repair, and re-seeded parts of the side that did not germinate.

{¶42} Pugh testified Protégé hired Hydrogreen because seed on the south slope did not establish and was causing erosion issues of the topsoil as documented by the ODNR. Protégé developed a restoration plan with Hydrogreen. Hydrogreen performed the re-seeding work in April 2016.

Pugh identified Hydrogreen Daily Reports which documented the re-seeding and re-planting efforts performed by Hydrogreen. Pugh testified Hydrogreen was successful in re-planting and re-seeding. None of the slips were extraordinary or unusual issues. Protégé satisfied the obligation of the ODNR demand letter. Pugh identified Exhibit D10, pictures of the well pad site taken in Spring 2016, which documented Hydrogreen's work. He testified there were no erosions or slips in the pictures because they had been remedied before or during the operation.

{¶43} Pugh testified that the rocks or boulders were moved as directed by Mr. Zimmer. He testified there were no issues with rocks or boulders considered to be extraordinary or unusual. Pugh admitted that possibly large rocks were missed during the final cleanup operations and left behind in the embankment. Pugh testified Protégé did leave telephone or waterlines exposed, however, Protégé did not have an agreement making it responsible to bury the lines.

{¶44} Exhibit D9 was the final punch list kept in the course of Protégé's business. Pugh described the cleanup efforts in detail. Pugh testified all the items were completed and he initialed the document. Pugh is not aware of any erosion happening after the site was re-seeded in spring 2016. The last time Pugh was at the Zimmerview property was April 12,

2019. He viewed the property from the roadside and did not see any additional erosions or slips that needed repaired.

{¶45} Pugh testified that he is unfamiliar with the exact definition of unusual or extraordinary in this circumstance. To his knowledge, there's no standard industry definition. Pugh disagreed that the gullies developing quickly would be considered unusual or extraordinary because the nature of the property changed significantly when the embankment supporting the well pad was built. Importantly, Pugh testified that if gullies appeared, it was the pad owner's responsibility to fix erosion and gully issues. He further testified that up to the time Protégé sold the well pad and well site, Protégé was responsible for fixing erosion and gully issues. If re-seeding failed, it was still the pad owner's responsibility. This testimony was key to the trial court's analysis.

{¶46} Finally, during Tara Fagen's testimony, she agreed that the Zimmer property was restored to "industry standards" and that restoration occurred "no later than June 21st, 2016." She testified Protégé spent a great deal of time and money making repairs due to Dean Zimmer's constant complaints about the slopes, drainage, seeding, and temporary lines. However, Fagen also admitted that she relies on the people in the field doing

the work.  She does not have a personal or professional opinion for what

constitutes acceptable industry standards for reclamation.

{¶47} In the Findings of Fact beginning at Page 3, the trial court wrote

as follows in paragraphs 15, 16, and 48:

> 15.  Dean Zimmer testified that he sought other specific assurances from Protégé regarding slope issues, slip repair, fencing, guards and gates, as well as landscaping.
>
> 16.  Prior to the construction of the drilling unit, Zimmerview, via Dean Zimmer[,] and Tarah Fagan of Protégé, entered into negotiations regarding the previously described issues.
>
> 48.  Protégé did not present any evidence regarding the intent of the parties regarding the Damage Release Agreement in Exhibit J-4.

{¶48} In the Conclusions of Law, beginning at Page 23, the trial court

further stated as follows in paragraphs 30-42 regarding claims for damage

related to cleanup/reclamation:

> 30.  All the evidence presented by Zimmerview indicates that the property has suffered substantial erosion and damage issues that have never been corrected by Protégé.
>
> 31.  Protégé did not present any evidence disputing the severity of the property damage.  Instead, as to these damage issues, Protégé's entire argument rests upon the Damage Release Agreement.
>
> 34.  The Damage Release Agreement was not an all-encompassing release, there were exceptions in the agreement that exempted the release from clean up responsibilities and operations that Protégé was required

to complete.   Further, there was an exemption for extraordinary or unusual damages.

35.  The terms "cleanup operations" and "extraordinary or unusual damages" are not defined in the Damage Release Agreement.

38.  The definition of these terms is not an argument that needs to be addressed by this Court because Protégé has acknowledged that there is a continuing duty and obligation to correct erosion issues.  Jason Pugh testified to this duty.

39.   This continuing duty regarding these issues also makes sense in light of the history to attempt to repair the land.   The evidence showed that Protégé made four attempts to correct issues with the property.  During those four attempts, Protégé never attempted to utilize the Damage Release Agreement to state it no longer had a responsibility to correct the erosion issues.

40.  The issues that Protégé previously corrected in its prior four attempts are the same issues that currently exist with the property.

41.  The Court hereby determines that the duties of Protégé have not changed and are the same as what they were in the prior four attempts to correct the issues.  Therefore, Protégé has an obligation to correct the erosion issues that it previously failed to address.  Protégé breached its general contractual obligations to Zimmerview as generally outlined in [exhibits] by failing to properly cleanup/reclamate the land.

42.  With Jason Pugh's testimony regarding the ongoing duties of the pad owner, the Court determines that the Damage Release Agreement is inapplicable for the damages claimed by Zimmerview. The Release is also inapplicable due to exceptions contained in the release.

{¶48} While the trial court did not make an explicit finding that the Oil and Gas Lease was ambiguous, the trial court's other findings support this conclusion. The lease addresses surface restoration at Paragraph 31 and generally provides that the Lessee "shall use commercially reasonable efforts to repair and restore such damaged portion of the surface of the Leased Premises as nearly as practicable to the condition in which said land existed before commencement of operations." Paragraph 31 further provides that "[a]ll restoration work shall be done at the sole expense of Lessee." The lease does not define "commercially reasonable efforts" nor state how many efforts are required to restore the property. The trial court likely viewed this language, especially "commercially reasonable efforts," as open-ended and ambiguous. Given the ambiguity surrounding Protégé's duty to restore the property using commercially reasonable efforts, the trial court properly allowed extrinsic evidence which explained the parties' intent, and which described the restoration efforts. The trial court appears to have relied heavily on Protégé's own witness, Jason Pugh, in reaching its conclusions.

{¶49} Here, the trial court judge served as the trier of fact. Weight and credibility of the evidence are issues that the trier of fact must determine. *See Cooper, supra*, at ¶ 28; *State v. Frazier,* 115 Ohio St.3d 139,

2007-Ohio-5048, 873 N.E.2d 1263, ¶ 106; *State v. Dye,* 82 Ohio St.3d 323,

329, 695 N.E.2d 763 (1998). A trier of fact may choose to believe all, part

or none of the testimony of any witness who appears before it. *See State v.*

*Colquitt*, 188 Ohio App.3d 509, 2010-Ohio-2210, 936 N.E.2d 76, ¶ 10, fn. 1

(4th Dist.); *State v. Nichols,* 85 Ohio App.3d 65, 76, 619 N.E.2d 80 (4th Dist.

1993). Based on our review of the trial testimony, we find the trial court had

some competent credible evidence to support its determination that Protégé

had an ongoing duty to restore the Zimmerview property. Accordingly, we

find no merit to the first assignment of error. It is hereby overruled.

{¶50} Under the second assignment of error, Protégé argued that the

trial court erred with regard to its interpretation of the terms "cleanup

operations" and "extraordinary or unusual" damages. Dean Zimmer

considered the damage left by Protégé to be unusual and extraordinary. He

testified:

> The production of the ground is very limited to none. The
> - - washed gullies is a severe problem, safety and cattle-
> wise. And production is - - has continued not to - - growth
> is not - - has not continued to - - growth is not- - of grass
> has not returned to where we could even, this whole length
> of time, to have any production farm-wise off of it.

{¶51} The trial court observed as set forth above that the terms

"cleanup operations" and "extraordinary or unusual damages" are not

defined in the Damage Release Agreement. In response to the second

assignment of error, Zimmerview argues that the trial court did not err in its interpretation of the contract terms as the court used a reasonable, logical, and plain application of the terms based on the evidence presented.

{¶52} Both parties somewhat mischaracterize the trial court's findings. As indicated above, the court further determined that cleanup operations encompassed activities occurring in the process of returning the land to Zimmerview in a similar condition as it was prior to construction, and that the failures in cleanup operations led to the current damaged state of the property. *Id*. at 36. In the Conclusions of Law, Page 24, the trial court further observed:

> 37. Both parties had differing views on what was considered extraordinary or unusual. Protégé appeared to apply an unknown industry standard. Zimmerview applied a standard related to operations on the property since 1927 * * *. The Court determines that the development of 4-foot gullies where [none] had existed before is unusual and extraordinary.
>
> 38. However, the definition of these terms is not an argument that needs to be addressed by this court because Protégé has acknowledged that there is a continuing duty to correct erosion issues.

{¶53} Based on our review of the trial transcript, we agree with the trial court's conclusion. The definition of the pertinent terms is unnecessary given the court's finding that Protégé's failure to properly cleanup and restore the Zimmerview property led to its current damaged state, and that

Protégé had a continuing obligation to correct the erosion issues.

Accordingly, we find no merit to Protégé's second assignment of error and it

is hereby overruled.

III.     THE TRIAL COURT ERRED IN FINDING FOR
        ZIMMERVIEW    ON    ITS    BREACH    OF
        CONTRACT   AND   CONVERSION   CLAIMS
        RELATED TO TOPSOIL.

{¶54} " 'In order to succeed on a breach of contract claim, a party

must prove the existence of a contract, the party's performance under the

contract, the opposing party's breach, and resulting damage.' " *Martin v.*

*Jones,* 2015-Ohio-3168, 41 N.E.3d 123, at ¶36 (4th Dist.), quoting

*DePompei v. Santabarbara*, 8th Dist. Cuyahoga No. 101163, 2015-Ohio-18,

at ¶ 20; *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio,* 174 Ohio

App.3d 29, 2007-Ohio-5562, 880 N.E.2d 926, ¶ 25 (4th Dist.).

{¶55} To prevail on a claim for conversion, a plaintiff must prove "(1)

plaintiff's ownership or right to possession of the property at the time of the

conversion; (2) defendant's conversion by a wrongful act or disposition  of

plaintiff's property rights; and (3) damages," *Key Realty, Ltd. V. Hall,* 2021-

Ohio-1868, 173 N.e.3d 831, at ¶ 95 (6th Dist.).

{¶56} The Supplemental Agreement executed by the parties herein

provides at Paragraph 3:

> Top Soil.  The top soil piled as part of the pad construction
> site which is generally set forth in the area set forth in
> Exhibit 1 hereto shall be *retained* by Zimmerview.
> (Emphasis added.) It shall be placed in a mutually agreed
> upon location not to exceed 500 (five hundred) feet from
> the area noted on Exhibit 1 unless otherwise agreed upon.

{¶57} Protégé argues that there was no breach of contract regarding the topsoil and no conversion of the topsoil stockpile.  Protégé contends that the trial court improperly relied upon extrinsic evidence to find a breach of the contract and a conversion because the evidence presented at trial did not support a finding that the topsoil had been converted.  Therefore, the trial court erred by finding for Zimmerview on these claims.

{¶58} In response, Zimmerview seems to assert that the trial court relied upon the plain language of the Supplemental Agreement but also acknowledges that the trial court did examine extrinsic evidence in construing the ambiguous topsoil clause.  Furthermore, Zimmerview asserts the court relied upon competent and credible evidence to determine that there was both a breach of contract and a conversion of the topsoil.  For the reasons which follow, we find the topsoil clause was ambiguous.  While the trial court did not make an explicit finding of ambiguity, the trial court properly relied upon competent and credible extrinsic evidence in reaching its conclusion that the contract was breached and the topsoil converted.

{¶58} During his testimony, Mr. Zimmer explained the

importance of topsoil and that lack of topsoil interferes with farming

operations because crops need the organic material and nutrients

within the topsoil.  Prior to the project, the Zimmers had over six

inches or more of topsoil on their properties.  Mr. Zimmer testified:

> The topsoil was to be retained by us. * * * We wanted it at
> the bottom of the LOD[9] area, just because of being easier
> access whenever it was used on our properties in the
> future.  They said that was too far to move it.  So we kind
> of went back and forth on where to—to put it, and then
> we—we did agree on the site that they did originally
> stockpile it, on top of the hill.

{¶59} Mr. Zimmer further testified that there was a large gully

at the bottom of the LOD construction area which he asked Protégé to fill,

because Zimmerview would completely lose five acres for pasture and

farmland.  Zimmer wanted the gully filled so it would be farmable.  Instead

of a monetary agreement for the loss, Protégé agreed to give Zimmerview

the topsoil in place of filling in the gully.

{¶60} Mr. Zimmer denied Protégé's arguments that Zimmerview did

in fact "retain" the stockpile of topsoil.  He testified the topsoil stockpile had

washed away into a nearby creek while Protégé was in control of the LOD

---

[9]LOD was not defined by any of the witnesses.  The photographic exhibits reference the LOD area, which depict the construction area on the Zimmerview property.

construction area. Furthermore, the evidence in this matter demonstrates

that Protégé used some of the stockpile of topsoil for purposes of its

reclamation of the area.

{61} James Vuksic testified that he assisted in negotiating

Paragraph 3 regarding the topsoil:

> [W]e asked them to fill the - - the gully, and so that would be farmable. They said they could not do that. And instead of, you know, a monetary agreement on that, the topsoil, they agreed to give us the topsoil in place of that, in place of filling the gully.

{¶62} Vuksic continued:

> So the long and the short is, they agreed that in lieu of either filling a ravine or in lieu of money- - I don't - - and I honestly don't recall which - - Dean agreed to take the top - - a pile of topsoil that was sitting there, in lieu of all that. They agreed to give it to him. And back and forth it went, as to how much it was, where it was going to be piled. Dean wanted it moved down close to the house or down to the bottom of the hill and they refused and said they would move it no more than 500 feet, and - - and pointed to the area where they would pile it for Dean, or for the Zimmers. And I went back to Dean and said, that's all the farther they're going to haul it. Do you want the dirt? And he said, Ok. We can move it ourself. [sic] And that was that.

{¶63} When asked about his understanding of what was supposed to

happen to the topsoil at the end once Protégé left the site, Vuksic testified:

> [L]ater he said, you know, they took the dirt and spread it over the hill, and I said well, then send them a bill for the

topsoil, because they took away your property. * * * They - - they stole his property. That was his.

{¶64} Jason Pugh also testified regarding the agreement pertaining to the topsoil. Pugh testified that one of the first things done to begin construction is that all the topsoil from a particular site is stripped and gathered at a particular location so it can be kept. The topsoil is preserved so that it can then be reused at the end of the well pad construction to be re-spread over the entire site that is to be seeded. In this case as well, the topsoil that was excavated was put into the stockpile. The stockpile of topsoil was used per standard general construction practice, to re-spread over the entire site and used as the subgrade for seed that was applied to the site.

{¶65} Jason Pugh testified the Supplemental Agreement did not prohibit Protégé from using the stockpile of topsoil in this manner. He agreed that the extra topsoil not used for the actual pad acreage was used on the reclamation of the property. Pugh also admitted that the word "retained" was not defined by the agreement. However, Pugh testified that "retained" meant that the topsoil did not leave the site and was retained by the owner on the property. Protégé did not remove the stockpile of topsoil from the property but moved it to a mutually agreed upon location.

{¶66} Pugh agreed that in Paragraph 3 there is nothing addressing whether topsoil can be removed from the stockpile. There is nothing in

Paragraph 3 that allows the soil to be used for reclamation.  He testified he did not know if the stockpile was gone at the end of construction.

{¶67} Pugh testified that Great Lakes Daily Reports provide additional information regarding re-spreading of the topsoil.  Pugh testified at the end of operations, Protégé and its contractors restored the topsoil to its former condition.  He testified there were no extraordinary or unusual issues with the topsoil.

{¶68} Brian Plautz reviewed the Great Lakes Daily Reports.  As part of the agreement with Protégé, Great Lakes replaced topsoil stripped from the area around the well pad.  Great Lakes spread the topsoil on the slopes when finished.  The topsoil was taken off site and put in a pile and then re-spread. Any remaining topsoil would have been left at the stockpile location. He testified that Great Lakes restored the slopes after construction.

{¶69} Plautz testified he did not have a role in negotiating the contracts.  He is not aware of the agreement between Zimmerview and Protégé regarding the topsoil stockpile.

{¶70} Tarah Fagan's testimony supported the argument that no breach occurred.  She testified no topsoil was removed from the grounds.  There was an agreement for the topsoil to be stockpiled in a certain area.  It was to stay on Zimmer property and be stockpiled for

reclamation.  The stockpile was not for Zimmer's personal use.  Fagan

testified there were no negotiations about that.  Fagan admitted that

the formal agreement did not specifically spell out that the topsoil was

to be used for reclamation.  However, the topsoil was never removed

from Zimmer's property but was used to reclaim the property.  In her

opinion, the topsoil was still Zimmer's property.

{¶71} No one on behalf of Zimmerview testified as to what "retained"

meant in the Supplemental Agreement.  Clearly, Dean Zimmer's testimony

demonstrated that he expected to have all the topsoil stockpile and did not

contemplate the topsoil stockpile would be re-spread and thus, considered to

have been "retained" by him.

{¶72} In the Findings of Fact and Conclusions of Law, the trial

court recited many of the facts as set forth in the testimony above.

Specifically, in the Conclusions of Law, Paragraph 8, the trial court

observed that Protégé did not present any testimony or evidence regarding

the intent of the topsoil provision contained in Exhibit J-2.  The trial court

analyzed as follows:

> 10.  There is specific language in Paragraph 3 regarding a
> specific location for the topsoil stockpile. * * * The
> language in Paragraph three regarding the specific location
> as well as evidence of negotiations regarding the location
> indicate the intent that the topsoil stockpile was to be left
> for Zimmerview after construction was completed.  There

would be no need for this location language if Protégé was simply going to utilize the topsoil stockpile for cleanup/reclamation shortly after excavation.

11.  Paragraph 2 of Exhibit J-2 indicates that the topsoil was to be a form of consideration.

12.  The topsoil has no value as a form of consideration unless Zimmerview is allowed to retain the topsoil stockpile for its use.  Further, the topsoil has no value as consideration if Protégé is allowed to use it for their own purposes.

13. There is no language in Paragraph 3 of the Supplemental Agreement which allows further use of the topsoil stockpile.

15.  Protégé's arguments regarding compliance with Paragraph three by utilizing the topsoil in cleanup/reclamation efforts lack merit. Without Paragraph 3, Protégé was already required to use commercially reasonable efforts to repair and restore the surface of Zimmerview's property as nearly as practical to the condition in which the land existed before commencement of operations.  Protégé was already operating under a contractual requirement to reclaim the land, thus Paragraph 3 would have no meaning pursuant to Protégé's interpretation.

17. Lastly Paragraph 3 indicates that the topsoil stockpile was not to be removed from its location "unless otherwise agreed upon."  This indicates at a minimum, that both parties would be required to have input before the stockpile could be moved from the agreed upon location. Protégé's actions indicate that they utilized the stockpiled topsoil without seeking approval or agreement from Zimmerview.  They utilized the topsoil at their own direction for their own needs on the construction site. There would be no need for language regarding mutual

agreement prior to removal of the stockpile unless it was intended that the stockpile remain intact for Zimmerview.

18.  Therefore, Protégé's failure to leave the topsoil stockpile for Zimmerview constitutes a breach of contract. The actions of Protégé also indicate that Protégé converted the topsoil for its own use to complete cleanup/reclamation efforts for which it was already contractually obligated to complete, i.e., it used Zimmerview's property to complete its contractual duties.

{¶73} Upon our de novo review, we agree with the trial court's sound reasoning which found Zimmerview had proven all elements of the breach of contract and conversion claims. The trial court implicitly found the contract language in the topsoil clause to be ambiguous and properly admitted extrinsic evidence regarding the intent of the parties. The trial court's analysis of the contract language relating to the topsoil is well-reasoned. Accordingly, we find no merit to the third assignment of error. It is hereby overruled.

IV.  THE TRIAL COURT ERRED IN DETERMINING THE AMOUNT OF DAMAGES TO AWARD ZIMMERVIEW BECAUSE IT DID NOT APPLY THE PROPER MEASURE OF DAMAGES AND RELIED ON SPECULATION.

{¶74} Dean Zimmer testified that the current state of his property was "nothing like it use to be." He testified when Protégé and Great Lakes left the well pad site in early fall 2015, they left parts of a fence behind. Cattle

attempted to go through the fence and were hurt. There were gullies and boulders, unsightly vegetation, and invasive weeds. Dean Zimmer made Protégé aware of the landscaping issues and contacted ODNR. Dean Zimmer, Billy Burkhart, and Larry Lang provided the only testimony as to damages at the bench trial.

{¶75} On the claims of breach of contract and conversion of the topsoil stockpile, the trial court rendered judgment in favor of Zimmerview and against Protégé in the amount of $450,000.00, plus interest at the statutory rate as of June 21, 2016, the date Protégé completed its operations on the Zimmerview property. Further, regarding Zimmerview's claims for damages regarding breach of contract for failing to properly reclamate and return the property to Zimmerview in a similar condition to what it was prior to construction of the well pad, the trial court rendered judgment in favor of Zimmerview and against Protégé in the amount of $349,093.00, plus interest at the statutory rate as of June 21, 2016. Protégé asserts the trial court relied on speculation and conjecture to determine the amount of damages awarded for property damages and the topsoil claim. However, Zimmerview responds that the trial court properly relied on the testimony of Dean Zimmer, Billy Burkhart, and Larry Lang. Therefore, the trial court did not abuse its discretion as the trial court's findings were supported by competent

and credible evidence.  For the reasons which follow, we agree with Zimmerview.

STANDARD OF REVIEW FOR DAMAGES

{¶76} " 'The cardinal rule of the law of damages is that the injured party shall be fully compensated.' "  *GM Gas Exploration, Inc. v. McClain,* 4th Dist. Athens No. 1438, 1991 WL 163644, (Aug. 13, 1991), at *5, quoting *Adcock v. Rollins Protective Services Co.*, 1 Ohio App.3d 160 (1981).  Trial court awards of damages are reviewed for abuse of discretion. *Green Maple Enterprises, LLC v. Forester,* 2021-Ohio-4640, -- N.E. 3d --, 2021 WL 6276316, at ¶ 44 (7th Dist.); *Griffin Contracting and Restoration v. McIntyre,* 2018-Ohio-3121, 107 N.E.3d 22 ¶ 35 (12th Dist.), citing and quoting *Roberts v. United States Fid. & Guar. Co.,* 75 Ohio St.3d 630, 634, 665 N.E.2d 664 (1996) ("[w]e will not disturb a decision of the trial court as to a determination of damages absent an abuse of discretion").  *See also Hubbard Family Trust v. TNT Land Holdings, LLC,* 2014-Ohio-772, 9 N.E.3d 411, at ¶ 63 (4th Dist.)

{¶77} In general, " ' "[t]he measure of damages in a conversion action is the value of the converted property at the time it was converted." ' " *Acme Co. v. Sanders TopSoil,* 7th Dist. Mahoning No. 10MA93, 2011-Ohio-6523¶ 52, quoting *Allied Erecting & Dismantling Co., Inc. v. Youngstown,*

151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, at ¶ 62, quoting

*Tabar v. Charlie's Towing Serv., Inc*. (1994), 97 Ohio App.3d 423, 428, 646

N.E.2d 1132. However, "[t]here is no inflexible rule as to the measure of

damages for a wrongful conversion." *Modarelli v. Fullerton Transfer &*

*Storage Limited, Inc.* (May 30, 1978), 7th Dist. No. 77 CA 128. *See also*

*Fulks v. Fulks*, 95 Ohio App. 515, 121 N.E.2d 180 (1953), at paragraph two

of the syllabus. " 'An award of damages must be shown with a reasonable

degree of certainty and in some manner other than mere speculation,

conjecture, or surmise.' " *Acme, supra* at ¶ 52, quoting *Elias v. Gammel*, 8th

Dist. No. 83365, 2004-Ohio-3464, at ¶ 25. Damages are not speculative

when they can be "computed to a fair degree of probability." *Allied*

*Erecting & Dismantling Co.* at ¶ 65. However, if the appellant

" ' "establishes a right to damages, that right will not be denied because the

damages cannot be calculated with mathematical certainty." ' " *Id*. at ¶ 64,

783 N.E.2d 523, quoting *Hollobaugh v. D & V. Trucking*, 7th Dist. No. 99

CA 303, 2001 WL 537058 (May 8, 2001), at *5, quoting *Barker v.*

*Sundberg*, 11th Dist. No. 92-A-1756, 1993 WL 489236 (October 25, 1993).

## LEGAL ANALYSIS

{¶78} Dean Zimmer testified that his property is non-productive for

farming. The vegetation is "slim to none." Mr. Zimmer identified

photographs of the Zimmerview property taken in 2020 which show weeds, mostly Marestail.[10]  The photographic exhibits depict extensive bare ground between the weeds and many boulders still needing removed.

{¶79} Mr. Zimmer testified the gullies are major problems and repairing these issues takes more equipment, time, and money than he has to invest.  He identified a photograph of himself standing inside a gully which came up to his waist.  He identified another photograph which showed the gully measuring four feet.  Zimmer testified the gullies continue to deepen over time.

{¶80} Mr. Zimmer also explained that the drainage tile used in the layers of well pad are not working properly and water is seeping out of the hill even without rain.  Water seepage is common in the well pad area.  It was his understanding that Protégé would remove the rock ledges.  The land is impassable with a tractor.  One of the rock ledges is over ten feet.  Some of the rocks were pushed to the edge of the LOD area and left behind.  The rock ledges are mostly bare ground.

{¶81} Zimmer testified he sought professional help.  Zimmer sought estimates from Billy Burkhart and Larry Lang.  Both men indicated the work

---

[10]"Marestail," also known as "horseweed," comes from the sunflower family and can grow as tall as 6 feet. It is resistant to some herbicides and is a major weed problem in corn and soybean areas.  *See* National Institute of Agriculture and Natural Resources, https://beef.unl.edu/beefwatch/marestail-horseweed. Accessed December 15, 2021.

set forth in their estimates will correct the issues depicted in the 2020

photographs of the LOD construction area.  The trial court found as follows,

beginning at Page 14:

> 95. Billy Burkhart testified that he was contacted by Dean Zimmer to provide an estimate for services to correct the issues with the property as well as replacing a portion of the topsoil stockpile that should have been left behind by Protégé.  Mr. Burkhart's estimate is contained in Exhibit P-17 and the math and the numbers used to come up with the numbers in the estimate is contained in Exhibit P-18.
>
> 96.  Billy Burkhart testified that the amount of topsoil for approximately 13.5 acres of topsoil at 6 inches deep would be approximately 1500 truckloads at a cost of $300.00 per truckload to deliver the topsoil to the property with a final price of $450,000.  The estimate also included $25,000 for the equipment necessary for the distribution and placement of the topsoil and an additional $25,000 for the seeding and mulching of the 8.5 acre hillside for a total estimate of $500,000.
>
> 97.  Larry Lang was also contacted by Dean Zimmer for an estimate to correct the issues.  Using the same parameters as Billy Burkhart, Larry Lang's estimate totaled $489,975.
>
> 99.  Protégé did not present any evidence or witnesses to dispute the estimates given by both Burkhart and Larry Lang and further did not dispute the current damaged state of the land.

**{¶82}** Based on the foregoing, this court cannot say the trial

court erred in concluding at Page 22:

20.  Pursuant to the testimony of Billy Burkhart, the cost to purchase and deliver 13.5 acres (1,500 truckloads) of topsoil at the price of $300 per truckload, would cost $450,000.

21.  Therefore, Zimmerview has been damaged in the amount of $450,000 as a result of the breach of the Supplemental Agreement of the Parties and conversion by Protégé of the topsoil stockpile.

The trial court further concluded at Page 25:

43.  As to the damages for said breach of contract, both Billy Burkhart and Larry Lang testified as to what would need to be done in order to repair the 8.5 acre area.  Both individuals testified to approximately the same manner by which to repair the land.  Pursuant to Exhibit P-19, it will cost approximately $283,500.00 for the topsoil to complete the repair on the 8.5 acre hillside, and will cost $43,000.00 for seeding, mulching, and completion of erosion control.  The total amount necessary to repair the hillside is $326,500.

44. Dean Zimmer also testified that he took multiple measures to attempt to mitigate the damages in this matter.  Exhibit P-55 indicates that Mr. Zimmer spent $22,593.00 on behalf of Zimmerview in his attempts to fix the issues with the land.

45.    Total damages for failure to properly perform clean up reclamation effort are $349,093.00.

{¶83} We have reviewed the record in its entirety and find no abuse of discretion.  The trier of fact is free to believe or disbelieve each and every one of Zimmerview's claims for damages.  We cannot substitute our judgment for that of the trier of fact who had the opportunity to hear the witnesses and observe their demeanor.  *Ross v. Ross*, 64 O. St. 2d 203, 414

N.E.2d 426 (1980); *State v. DeHass*, 10 O. St. 2d 230, 227 N.E.2d 212

(1967). Based on the foregoing, we find no merit to Protégé's fourth

assignment of error. Accordingly, it is hereby overruled.

> V. THE TRIAL COURT ERRED BY FINDING PROTÉGÉ HAD BREACHED ITS AGREEMENT WITH ZIMMERVIEW BY FAILING TO PAY ADDITIONAL RENTS BY IGNORING THE PLAIN LANGUAGE OF THAT AGREEMENT AND RELYING ON EXTRINSIC EVIDENCE.

{¶84} The third count of Zimmerview's complaint related to

Zimmer's lack of access to a portion of his pasture land in the amount of

$20,000.00 plus interest. The trial court rendered judgment in favor of

Zimmerview and against Protégé on this claim in the amount of $20,000.00,

plus interest at the statutory rate as of June 21, 2016. The court found

Protégé breached the Supplemental Agreement by preventing Zimmerview's

access to the property due to construction lasting in excess of one year from

the date construction started. "Additional rents" were provided for in

Paragraph 10 of the Supplemental Agreement as follows:

> ADDITIONAL CONSIDERATION: In the event that Protégé's operations prevent Zimmerview from obtaining access to the 3 (three) acres of pasture east of the access road for a time period exceeding 1 (one) year from the commencement of site construction operations then Zimmerview shall be entitled to an annual payment of $20,000 (Twenty thousand Dollars) as additional

consideration for its inability to access that portion of its property until access is restored.

**{¶85}** Protégé contends that the trial court again ignored the plain language of the agreement and improperly relied on extrinsic evidence in finding a breach. By contrast, Zimmerview responds that both the plain language and evaluation of the extrinsic evidence lead to the same conclusion. For the reasons which follow, we agree with Zimmerview.

**{¶86}** The trial transcript reflects Dean Zimmer testified three acres of his land was fenced off from being farmed because of the well pad; the pasture land could not be used until the well pad was built and fencing was removed. Zimmer testified that the agreement was if Protégé was there for more than a year and kept the Zimmers from farming or using the land for more than a year, Protégé would pay $20,000.00. James Vuksic assisted in negotiating the term. Zimmer testified there was no discussion at all of a "pro rata" or "monthly" basis.

**{¶87}** James Vuksic testified he was familiar with Paragraph 10 of the Supplemental Agreement. He testified, "No one believed [Protégé] would be there longer than a year. And if they were, they were to pay whatever the fee was. That was it. * * * Dean insisted if they were they had to pay it, and they said no problem." When questioned about whether the parties

discussed a pro rata distribution, Mr. Vuksic responded, "No. it was a fee. If you went over the year, you paid a fee."

{¶88} Jason Pugh testified that Protégé agreed to pay Zimmerview rents/compensation if they were unable to restore Zimmer's access to a certain portion of the site within a specified date. Construction commenced on May 4, 2015, and the fence was removed according to Hydrogreen's daily report on June 21, 2016, two months past one year. However, Pugh testified that the prorated amount was what was agreed to in Paragraph 10.

{¶89} In the Findings of Fact and Conclusions of Law, at Page 6, the trial court found:

> 37. Paragraph 10 of Exhibit J-2 indicates that if Protégé's operations prevent Zimmerview from obtaining access to lands for one year from the commencement of site construction that Zimmerview is entitled to a $20,000 annual cash payment as additional consideration for Zimmerview's inability to access portions of its property.

{¶90} The trial court concluded at Page 22:

> 23. Both parties acknowledge that Zimmerview was prevented access to the land for a period of greater than one year. Therefore, there is no dispute that Protégé is in breach of Paragraph 1- of the Supplemental Agreement of the Parties.

> 25. There exists no pro rata or monthly language contained in Paragraph 10 of Exhibit J-2. It would have been very easy for Protégé to have added such language to that provision if that was their intent.

28.     Since there is no contract language contained in Paragraph 10 that supports Protégé's position of pro rata distribution of the $20,000.00 provision, Zimmerview is entitled to payment of $20,000.00 pursuant to Paragraph 10 of the Supplemental Agreement of the Parties. Thus, the date construction started is inconsequential since Paragraph 10 does not call for pro rata or monthly distribution for periods extending over one year.

29.  Therefore, Zimmerview has proven Protégé breached Paragraph 10 of the Supplemental Agreement of the Parties by a preponderance of the evidence and Zimmerview is entitled to judgment on Paragraph 10 in the amount of $20,000.00.

{¶91} The trial court allowed a great deal of extrinsic evidence which supported Zimmerview's claims.  The trial court referenced much of this evidence in the Findings of Fact and Conclusions of Law. However, as indicated above, the trial court's decision rested on the court's legal interpretation of Paragraph 10.  As indicated above, the trial court's interpretation of contract language is subject to de novo review.

{¶92} In this case, we find the trial court properly construed the language contained in Paragraph 10.  Paragraph 10 references an "annual payment," and does not contain pro rata language.  The trial court noted the absence of pro rata language, which could have been easily included. Black's Law Dictionary, Abridged Sixth Edition, defines "annual" as, "[o]f or pertaining to year; returning every year; coming or happening yearly." While the trial court referenced the testimony surrounding the inclusion of

Paragraph 10, the trial court's legal determination is easily supported by the clear and unambiguous language of Paragraph 10. Protégé's fifth assignment of error is without merit and it hereby overruled.

CONCLUSION

Having found no merit to any of Appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**